# CHICAGO, ST. LOUIS AND NEW ORLEANS RAILROAD COMPANY *v.* PULLMAN SOUTHERN CAR COMPANY.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 118. Argued December 16, 1890. — Decided March 2, 1891.

The Pullman Southern Car Company, operating drawing-room and sleeping cars, hired ten of such cars to a railroad company at the compensation of three cents per mile per car for every mile run by its cars upon the lines of the railroad company. The railroad company agreed, when requested, to repair the cars furnished under the contract as it might become necessary, and, without request, to make such repairs as were required to insure their safety, rendering bills monthly to the Pullman Company and charging for such repairs only the actual cost of the material and labor expended. The railroad company assumed responsibility for damages to the cars occasioned by "accident or casualty" while the sleeping car company assumed responsibility for loss or damage arising from defective heating apparatus or lights furnished by it. The latter company was to have the exclusive right for fifteen years to furnish drawing-room and sleeping cars on all passenger trains of the railroad company, the latter binding itself not to contract with any other party to run said class of cars on and over its lines during that period. If either party failed to keep and perform its covenants the one not in default could, upon written notice, declare the contract at an end. The railroad company had the option to terminate the contract at the end of five, eight or eleven years, upon written notice served six months before the date fixed for such termination. Two of the sleeping cars, the Louisiana and Great Northern, were entirely destroyed by fire originating "from a cause unknown;" the former at the time of the fire being on the railroad track under a depot shed used by the railroad company to store cars when not in actual transit, and the latter being in a shop belonging to the railroad company, known as the Pullman repair shop, which had been assigned to the exclusive use of the sleeping car company as a place where it could repair its own cars. This shop at the time of the fire was in the possession of the Pullman Company, the railroad employés having no access thereto. The Great Northern had been in that shop for repairs by its owner for six months before the fire, and but for the fire would have been in condition to have been again put in actual use by the railroad company on the day succeeding the fire. Both the Louisiana and the Great Northern were insured by the Pullman Company.

After the fire the insurance companies paid $19,000 in full settlement of the loss and damage, and this action was brought by the Pullman Company against the railroad company to recover the value of the burned cars under an agreement between it and the insurance companies that the recovery should be equally divided by them. There was a verdict and judgment for the plaintiff. *Held*,

(1) The fire having "originated from a cause unknown" the losses were, within the meaning of the contract, "occasioned by accident or casualty."

(2) The collection of the insurance money did not affect or impair the right of the sleeping car company to recover the amount of the loss according to the contract with the railroad company. Upon payment of the loss, or to the extent of any payment by them on account of the loss, the insurance companies were subrogated to the rights of the insured and could in its name, or in their joint names, maintain an action against the railroad company for indemnity, if the latter was liable to the insured for the loss of the cars; this, because the liability of the railroad company was, in legal effect, first and principal, and that of the insurer secondary, not in order of time but in order of ultimate liability.

(3) The contract was not void as being in general restraint of trade or against public policy. The contract is to be interpreted in view of the condition implied by law that the sleeping car company should furnish cars not only adequate and safe but sufficient in number for the use of the public travelling over the lines of the railroad company. Such condition was not and could not have been dispensed with. Whether the agreement is so far divisible that the stipulation giving the sleeping car company exclusive rights and binding the railroad company not to make similar contracts with other parties during the stipulated term could be separated from the other provisions, *quære*.

(4) The railroad company was responsible for the loss of the Louisiana because it was in active service under the contract, and was in the possession and under the exclusive control of the railroad company for the purpose simply of being cleansed and resupplied for another trip whenever the railroad company chose to put it into service.

(5) The railroad company was not liable for the loss of the Great Northern, because that car at the time of the fire was in the exclusive possession of the sleeping car company and, when burned, was not subject to be used by, nor under the supervision of, the railroad company.

THE case is stated in the opinion.

*Mr. Girault Farrar* and *Mr. Thomas J. Semmes* for plaintiff in error. *Mr. James Fentress* was with him on the brief.

*Mr. George B. Eastin* and *Mr. Edgar H. Farrar* for defendant in error. *Mr. Thomas F. Hargis* and *Mr. Sterling B. Toney* were with them on the brief.

Mr. Justice Harlan delivered the opinion of the court.

This action was brought by the Pullman Southern Car Company to recover from the Chicago, St. Louis and New Orleans Railroad Company the damages alleged to have been sustained on account of the destruction by fire of two of the plaintiff's sleeping cars, the Great Northern and the Louisiana, while on the premises of the defendant. There was a verdict and judgment for the sum of $19,000, with interest from September 20, 1886, the date of judicial demand, at the rate of five per cent per annum until paid, with costs. The assignments of error relate entirely to instructions given on behalf of the plaintiff, and to the refusal to give instructions asked by the defendant.

The action is based upon a written agreement between these corporations, dated April 5, 1879, showing that the business of the plaintiff was to operate drawing-room and sleeping cars which it hired, under written contracts for a term of years to be used and employed on and over the lines of railway companies, receiving therefor income and revenue by the sale to passengers of seats, berths and accommodations therein; and that the defendant was desirous of availing itself of their use, on its own routes, and also of connections, by means of such drawing-room and sleeping cars, with other railroads over which the plaintiff was running its cars. In order to effect the objects of the parties it was, among other things, agreed as follows:

1. The plaintiff was to furnish drawing-room and sleeping cars "sufficient to meet the requirements of travel," on and over the defendant's railway, and such roads as the latter then or thereafter controlled as owner, lessee or otherwise; the cars so furnished to be satisfactory to the general manager or superintendent of the railroad company, and to be in part certain named cars, ten in number, among which were the Louisiana and the Great Northern, then operated on the defendant's

lines. 2. Each of the plaintiff's cars was to be manned, at its own cost, by one or more of its employés, as might be needful for the collection of fares and the comfort of passengers; such employés to be subject to the rules and regulations established by the defendant for its own employés. 3. "In consideration of the use of the aforesaid cars" the defendant was to haul them on passenger trains on its own lines of railroad, and on passenger trains on which it might, by virtue of contracts or running arrangements with other roads, have the right to use them, "in such manner as will best accommodate passengers during the use of said cars." 4. By article sixth of the agreement, all necessary lubricating material, ice, fuel and material for lights, were to be supplied, and the washing and cleansing of the cars furnished under the contract to be done, by the defendant at its expense, which should also renew and replace, as often as necessary, links, pins, bell-cord and couplings for air-brake hose, without charge to the plaintiff. 5. The plaintiff was to keep the cars furnished under the contract in good order and repair; renew and improve them, when necessary, at its own expense; keep them up to the average standard of the best and most approved sleeping cars on any road using an equal number of cars, "excepting repairs and renewals provided for in article sixth of this agreement, and such as are made necessary by accident or casualty, it being understood that the railway company shall repair all damages to said cars of every kind occasioned by accident or casualty during the continuance of this contract, except that the Pullman Company assumes all responsibility for any loss or damage occurring to said cars arising from defective heating apparatus or lights furnished by it." 6. As proper compensation for the maintenance of the running gear and bodies of the cars, the defendant was to pay plaintiff "three cents per car per mile for every mile run by said cars upon the road of the railway company or upon the roads of other companies by direction of the officers of the railway company while in service under this contract;" and, at all times, when requested by the plaintiff, to make promptly such repairs to the cars furnished under the contract as might from time to time be-

come necessary, and, without request, make such repairs as were required " to insure their safety, rendering bills monthly to the Pullman Company for repairs to cars and charging for the same only the actual cost of material and labor expended on such repairs, with an addition of ten per cent to cover general expenses, all settlements and payments for mileage and repairs to be made monthly between said companies." 7. Whenever the revenue from sales of seats and berths equalled an average of $7500 per car per annum upon the number of cars furnished under the contract, then, and while such revenue continued, the defendant should not pay mileage for any car so furnished ; the plaintiff, in such case, to bear the expense of all repairs and improvements to its cars, " except such repairs as are rendered necessary by accident or casualty and such as are provided for in article sixth of this agreement, which shall be made by the railway company, as hereinbefore mentioned." 8. The plaintiff was to have the exclusive right, for a term of 15 years, from the date of the agreement, to furnish drawing-room and sleeping cars for the defendant's use on all its passenger trains on roads then or subsequently controlled or owned by it, and on roads over which it had the right to run such cars ; the defendant not to " contract with any other party to run said class of cars on and over said lines of road during said period of fifteen years." 9. In case either party failed to cleanse or repair any of the cars, according to the conditions of the agreement, and the party so in default should neglect and refuse to perform its agreement in this respect within a reasonable time after notice of such default, the other party had the right to cleanse, and make or cause to be made all necessary repairs and renewals to said cars, at the cost of the party in default. 10. If either party failed, at any time, to keep and perform its covenants, as set forth in the agreement, the one not in default, after the expiration of a reasonable time from the service of written notice of such default, was at liberty to declare the contract at an end. 11. The defendant was given the option to terminate the contract at the end of five, eight, or eleven years, upon written notice to the plaintiff, served six months before the day fixed

for such termination; and, if the contract was so terminated, without default upon the part of the plaintiff, the defendant was required to purchase the cars and equipments of the Pullman Company "then in use or assigned and accepted for use" under the contract, or such interest therein as the defendant may not have previously acquired under the provisions of this contract, at the actual cash value of the same," with the right to use them without charge for patent rights for their interior arrangements. For the purposes of the option given to terminate the contract, it was agreed "that the cars now [then] running on said railroad, and which should form part of the cars and equipments to be furnished under this contract, together with such additional cars and equipments as may hereafter be assigned to the railway company, shall be appraised, etc." 12. The taxes upon all cars furnished to the defendant by the plaintiff were to be paid equally by the parties.

It was in proof that at the time of the fire the cars Great Northern and Louisiana were insured for the plaintiff; that before the commencement of this action the insurance companies paid to it, in full settlement of the loss and damage, the sum of $19,000; and that this action is prosecuted under a written agreement between the plaintiff and the insurance companies, that it should be conducted jointly by their counsel, and the amount recovered by suit, settlement or compromise, equally divided between them.

The ten cars mentioned in the agreement of April 5, 1879, were furnished to the defendant and were used on its road. Subsequently to that date, the plaintiff having complained of the manner in which its cars were repaired at the defendant's shops in McComb City on its road about 105 miles above New Orleans, the latter, by its president, suggested that the plaintiff repair its own cars. Thereupon, in order to facilitate such repairing, a part of the passenger-car depot shed of the defendant in New Orleans was set apart to the exclusive use and control of the plaintiff, which, at its own expense, fitted up the portion so assigned to it — one part as a linen room, one as a carpenter shop, one as an upholstery room and one

as a paint shop — enclosing the same with partitions, and keeping it locked with the keys in possession of its own employés. The place so fitted up was known as the "Pullman repair shop." The employés of the defendant had no right of access to it. Although the tracks of the defendant extended into this repair shop, there were folding-doors across them that were, closed by an iron bar on the inside. The plaintiff paid nothing for the use of this shop. The watchman over the whole premises was maintained by the defendant. With the permission and consent of the defendant, the plaintiff, on one or two occasions, repaired and varnished in that shop cars assigned by it to other railroads, and not covered by the agreement in question.

The fire in question " originated from a cause unknown " in the "Pullman repair shop." It occurred about 3 o'clock on the morning of the 27th of May, 1882, and resulted in the total destruction of both the Great Northern and the Louisiana. The Great Northern was at the time standing on the defendant's track in the paint room of that shop, behind the barred folding-door across the railroad tracks. It had been there since the previous October undergoing repairs, refitting, and revarnishing, and its name changed to that of " Chatawa." But for its destruction it would have been in condition on the day succeeding the fire to be again put into service under the contract of 1879. There was no evidence that any other car was furnished to take its place on the defendant's road while it was in the shop undergoing repairs. When the fire occurred, the Louisiana was standing on the defendant's track, in New Orleans, under a depot shed belonging to it, and used to store cars when not in actual transit — those belonging to it as well as those belonging to the plaintiff. That shed was called by the defendant's employés the " Pullman shed." The Louisiana reached New Orleans about 3 o'clock in the afternoon of May 26, 1882, from a trip over defendant's road, was placed in the above depot shed, and was to have been sent out on another trip at 6 o'clock on the afternoon of May 27, 1882. The Great Northern, when burned, was under the same depot shed, but, as already stated, in that part known as the Pullman

repair shop. It is in evidence, that at various times during the existence of the contract sued on, the plaintiff took some of the ten cars, furnished under it, to shops in St. Louis, Missouri, and Pullman, Illinois, entirely off the line of defendant's road, in order to be repaired, so as to bring them up to the designated standard.

The question of negligence was left to the jury, which was instructed that the plaintiff could not recover if the fire was caused by its negligence.

1. The jury were instructed, at the request of the plaintiff, that a damage or destruction by fire is a casualty or accident within the meaning of the contract. This the defendant contends was error. We do not think so. The fire that destroyed the Great Northern and the Louisiana originated, as we have seen, from a cause unknown. An accident or casualty, according to common understanding, proceeds from an unknown cause or is an unusual effect of a known cause. Either may be properly said to occur by chance and unexpectedly. Webster's Dict.; Imperial Dict. It was no doubt used in that sense by the parties to the contract in question. They manifestly contemplated that the railroad company should assume all responsibility for the loss of drawing-room or sleeping cars, while in use, or subject to be used, by it, with the single exception, distinctly made, of loss or damage occurring "from defective heating apparatus or lights furnished" by the Pullman Company, which assumed all responsibility for loss or damage to its cars resulting from either of the latter causes. This exception in respect to defective heating apparatus and lights furnished by the plaintiff — necessarily referring to loss or damage by fire caused in either of those modes — renders it clear that the railroad company assumed responsibility for the loss of cars used or subject to be used by it under the contract, whenever such loss was by fire occurring from a cause unknown, that is, accidentally or from casualty.

2. The jury were instructed that the insurance of the cars by the plaintiff was *res inter alios acta* and had no determining effect upon the right of the plaintiff to recover in this action. The giving of this instruction has been assigned for

error. We are of opinion that the obtaining of insurance by the plaintiff, the collection of $19,000 in full settlement of its claim against the insurance companies, and the agreement between it and them for the bringing of this action for their joint benefit, were matters with which the railroad company had no concern, and cannot affect the determination of this case. By the provisions of the policies, the insurance companies were entitled, in case of loss, to an assignment of the plaintiff's right to recei.e satisfaction therefor from any other person or persons, town or corporation, with a power of attorney to sue for and recover the same at the expense of the insurer. Upon payment of the loss, or to the extent of any payment by them on account of such loss, the insurance companies were subrogated to the rights of the insured, and could, in the name of the insured, or in their joint names, maintain an action against the railroad company for indemnity, if that company was liable to the insured for the loss of the cars. The acceptance of a given amount from the insurance companies in full discharge of their liability, did not affect the right of the plaintiff to recover from the railroad company the whole amount of the loss for which the latter was responsible under its contract. The plaintiff could recover only one satisfaction for the loss; and if the amount recovered from the railroad company, increased by the sum collected from the insurance companies, was more than sufficient for its just indemnity, the excess would be held by it. in trust for the insurance companies. The inquiry in this action is as to the amount for which the railroad company is bound on *its* contract with the plaintiff, and the recovery is not affected or limited by the amount collected from the insurance companies. As said in *Mobile & Montgomery Railway* v. *Jurey*, 111 U. S. 584, 593 — which was a suit against a carrier — "although the suit is brought for the use of the insurer, and it is the sole party beneficially interested, yet its rights are to be worked out through the cause of action which the insured has against the common carrier. The legal title is in the insured, and the carrier is bound to respond for all the damages sustained by the breach of his contract. If only part of the loss has been

paid by the insurer, the insured is entitled to the residue."
See also *Phœnix Insurance Company* v. *Erie Transportation
Company*, 117 U. S. 312, 320, 321. This is because, as said by
Chief Justice Shaw in *Hart* v. *Western Railroad Corporation*,
13 Met. 99, the liability of the railroad company is, in legal
effect, first and principal, and that of the insurer secondary,
not in order of time, but in order of ultimate liability. So
in *Weber* v. *Morris & Essex Railroad*, 35 N. J. Law, 409:
"Notwithstanding such payment, an action will lie by the
insured against the railroad company. The insurance is to be
treated as a mere indemnity, and the insured and insurer
regarded as one person ; therefore, payment by the insurer
before suit brought cannot affect the right of action." To
the same effect are numerous other cases. *Fretz* v. *Bull*, 12
How. 466, 469 ; *Hall & Long* v. *Railroad Companies*, 13
Wall. 367, 370 ; *Merrick* v. *Van Santvoord*, 34 N. Y. 208 ;
*Conn. Fire Ins. Co.* v. *Erie Railway*, 73 N. Y. 399 ; *Clark* v.
*Wilson*, 103 Mass. 219 ; *Hayward* v. *Cain*, 105 Mass. 213 ;
*Gales* v. *Hailman*, 11 Penn. St. 515 ; *Perrott* v. *Shearer*, 17
Michigan, 48 ; *Peoria Ins. Co.* v. *Frost*, 37 Illinois, 333 ;
*Conn. Mut. Life Ins. Co.* v. *New York & New Haven Rail-
road*, 25 Connecticut, 265 ; *Swartwout* v. *Chicago & North-
western Railway*, 49 Wisconsin, 625. The principle is thus stated
by Lord Blackburn in *Burnand* v. *Rodocanachi*, 7 App. Cas.
333, 339 : "The general rule of law (and it is obvious justice)
is, that where there is a contract of indemnity (it matters not
whether it is a marine policy, or a policy against fire on land,
or any other contract of indemnity) and a loss happens, any-
thing which reduces or diminishes that loss reduces or dimin-
ishes the amount which the indemnifier is bound to pay ; and
if the indemnifier has already paid it, then, if anything which
diminishes the loss comes into the hands of the person to
whom he has paid it, it becomes an equity that the person
who has already paid the full indemnity is entitled to be
recouped, by having that amount back." *Castellain* v. *Pres-
ton*, 11 Q. B. D. 380. It results that the court was right in hold-
ing that the insurance upon the cars and the collection by
plaintiff of the insurance money were immaterial matters in

this litigation. The action was well brought in the name of the plaintiff pursuant to its agreement with the insurance companies.

3. It is assigned for error that the court refused to instruct the jury that the agreement sued on was void as against public policy, because of the exclusive rights given to the plaintiff for the term of fifteen years in respect to drawing-room and sleeping cars furnished by it to the defendant, supplemented by the stipulation that the defendant would not "contract with any other party to run the said class of cars on and over said lines of road during said period of fifteen years;" and because the law will not permit individuals to oblige themselves by a contract, when the thing to be done or omitted is injurious to the public. *Oregon Steam Nav. Co.* v. *Winsor,* 20 Wall. 64, 66; *Chappel* v. *Brockway,* 21 Wend. 157, 159. Such a contract, it is argued, is in general restraint of trade. The authorities cited in support of this contention have no application to such a contract as the one before us. The defendant was under a duty, arising from the public nature of its employment, to furnish for the use of passengers on its lines such accommodations as were reasonably required by the existing conditions of passenger traffic. Its duty, as a carrier of passengers, was to make suitable provisions for their comfort and safety. Instead of furnishing its own drawing-room and sleeping cars, as it might have done, it employed the plaintiff, whose special business was to provide cars of that character, to supply as many as were necessary to meet the requirements of travel. It thus used the instrumentality of another corporation in order that it might properly discharge its duty to the public. So long as the defendant's lines were supplied with the requisite number of drawing-room and sleeping cars, it was a matter of indifference to the public who owned them. *Express Cases,* 117 U. S. 1, 24, 25. We cannot perceive that such a contract is at all in restraint of trade. The plaintiff was at liberty, so far as that contract was concerned, to make similar arrangements for the accommodation of passengers on all other railroads in the country, even those that are rivals or competitors in business with the defendant.

It is, however, a fundamental condition in all such contracts that their provisions must not be injurious to the public. As said by this court in *Cherokee Nation* v. *Kansas Railway Co.*, 135 U. S. 641, 657, a railroad is a public highway, established primarily for the convenience of the people and to subserve public ends. A railroad corporation cannot, therefore, without the sanction of the government creating it, make any agreement that militates against .the public convenience, or that will defeat the public objects for which it was established. If the contract in suit was liable to objection upon these grounds, a different question would be presented for our determination. But we are of opinion that public policy did not forbid .the railroad company from employing the Pullman Southern Car Company to supply drawing-room and sleeping cars to be used by its passengers, and, as a means of inducing the plaintiff to perform this public service and to incur the expense and hazard incident thereto, from giving it an exclusive right to furnish cars for that purpose. The defendant did not, by such an agreement, abandon .the duty it owed to the public; for the cars so furnished, while in its possession and use, became, as between it and its passengers, its own cars, subject to such regulations as it might properly establish for the comfort and safety of passengers on its trains. *Pennsylvania Company* v. *Roy*, 102 U. S. 451, 457. And the contract is to be interpreted in view of the condition, implied by law, that the plaintiff should furnish cars not only adequate and safe but sufficient in number for the use of the public desiring to travel over the defendant's roads. These conditions exist independently of the particular clause giving the railroad company the option to terminate the agreement at the end of five or eight or eleven years. Being imposed by law, as necessary to the public interests, they could not be dispensed with by agreement of the parties. The designation of particular periods of time, at the end of either of which the defendant might, of right and upon notice, terminate the agreement, did not tie its hands so that it could not continuously discharge its duty to the public in respect to the adequacy or safety of cars in which it conveyed passengers.

The stipulation, therefore, that the plaintiff, not being in default, should have the exclusive right for fifteen years to furnish drawing-room and sleeping cars for the defendant's use, and that the defendant should not, during that period, contract for cars of that kind with any other party, rightly construed is not unreasonable, and, properly performed, will promote the convenience of the public in that it enables the defendant to have on its lines, at all times, and as the requirements of travel demand, drawing-room and sleeping cars for use by passengers. It is a stipulation that does not interfere in any degree with its right and duty to disregard the contract whenever the plaintiff fails in furnishing cars that are adequately safe and sufficient in number for the travel on defendant's lines. The suggestion that the agreement is void, upon grounds of public policy, or because it is in general restraint of trade, cannot, for the reasons stated, be sustained.

Besides, it is not clear that the agreement is so far indivisible, that the stipulation giving the plaintiff the exclusive rights in question, and binding the defendant not to make similar contracts with other parties for drawing-room and sleeping cars to be used on its lines, cannot be separated from the other provisions. If that stipulation were held to be void, upon the grounds suggested, we should be inclined to hold that, as between the parties, the provision making the railroad company liable for loss or damage, arising from casualty or accident, to the plaintiff's cars, while in the possession of and subject to use by the defendant, remained in force. *Erie Railway Co.* v. *Union Locomotive and Express Co.*, 35 N. J. Law, 240, 246.

4. There can be no doubt that the railroad company was, under the evidence, liable to the plaintiff on account of the loss by fire of the Louisiana. The contract covered cars that were assigned by the plaintiff to the defendant's use, while they were in actual transit over its lines or over the lines of other companies on whose roads they were sent by the defendant. It equally covered such as were under the defendant's immediate control while in its own yards or sheds for the purpose simply of being cleansed and resupplied for

another trip when the defendant chose to put them into actual service. That was the situation at the time of the loss by fire of the Louisiana. It had a few hours before come from active service on the defendant's road, and, but for its destruction, would have been put upon the road for another trip in the afternoon of the very day of the fire. Such a case is plainly embraced by both the letter and spirit of the contract. A peremptory instruction to find for the plaintiff in respect to the Louisiana would not have been erroneous.

5. The remaining instructions involved the liability of the defendant on account of the destruction by fire of the car Great Northern. The defendant asked the court to instruct the jury as follows: "That if the jury believe from the evidence that the defendant company, by arrangement with the plaintiff company, in the year 1879, set apart at their depot in the city of New Orleans a certain portion of said depot for the exclusive use and benefit of plaintiff as a repair shop, wherein the cars of the plaintiff mentioned in the contract sued on were to be repaired by the plaintiff at its own expense, and the said space was inclosed, fastened and locked, and the keys thereof were kept by the plaintiff or its agents so that access thereto by the defendant or its agents was only such access as was necessary to enable the defendant company to take possession of repaired cars when tendered for service by the plaintiff, and that at the time of the fire, on the 27th of May, 1882, the car Great Northern was in the said repair shop, and had been there for a period exceeding six months, for the purpose of being repaired, and that at the time of the fire said car had not been tendered for service as a car completely repaired and equipped for service to the defendant, although ready to be tendered, then the jury must find that the defendant is not liable for the loss of the said car Great Northern or for any damage thereto by fire aforesaid." This instruction was refused except with this modification: "Unless the jury further find that the said car had been withdrawn from the dominion of the contract, and it was held, according to the understanding of both parties, for some other purpose — that is, for some other purpose than those of the contract."

The court, in its general instructions to the jury, said : "It was undoubtedly competent for the parties to this action to have withdrawn their cars from the dominion of the contract, but to constitute such a withdrawal there must be the intent of the plaintiff to retain them for some purpose other than to continue their use under the contract; and if the jury find that there was a placing of the cars in the separate room or apartment with the intent, on the part of the plaintiff, to use them independently of the contract and not under it, then the defendant would not be liable for their destruction. If, on the other hand, the jury find that though there was a placing of the cars in the separate room or apartment, but with the intent to continue to use them under the contract, and to hold them so placed merely for the purpose of repair under the contract, and the defendant shared this intent, then the defendant would be responsible for their destruction by fire. In determining this question the jury will consider all the facts and circumstances established, including the fact that the cars remained on the tracks of the defendant, and will further consider whether the defendant is shown to have any relations to these cars except under the contract."

The defendant, also, asked this instruction : "That if the jury believe that the two cars, Louisiana and Great Northern, were destroyed by fire at the depot of the defendant company, while the said cars were not in actual use and service by the defendant company, then they must find a verdict for the defendant." The court refused to give this instruction, saying : "I refuse that instruction, provided you find that they were being repaired under the contract. That's the test which the court gives you all the way through — whether these cars, according to the meaning of the parties, were or were not under the contract, the contract providing for repairing as well as running." The court having, in this connection, instructed the jury, at plaintiff's request, that "the said contract covers the said cars while standing on the tracks of the defendant in the yards, and under the sheds used for storing cars while not in transit," said that the contract covered the cars "while standing on the tracks of the defendant in its

yards and under the sheds used for storing cars while not in transit, but while held for transit or repair on defendant's tracks under the contract."

It was not error to refuse that one of defendant's. requests for instructions, predicated upon the theory that its liability for the loss of a car from accident or casualty depended upon such car being, at the time, in its "actual use and service." Of· course, the defendant meant by this instruction, and the jury would have understood, that a car was not in actual service while it was standing on the defendant's tracks, "between trips." That theory would have relieved it from responsibility for the loss of·the Louisiana, although that car had come from the road only a few hours previous to the fire, and was, when destroyed, in the immediate possession and control of the railroad company, being cleansed and prepared for the use of passengers on another trip to be entered upon in the afternoon of the day of the fire. We have already said that this interpretation of the contract was unsound.· But we are of opinion that the court below erred in not giving, without modification, the first of the above instructions asked by the defendant. By the terms of the agreement, the railroad company was bound, upon request, to make promptly such repairs of the cars furnished to it as might from time to time become necessary, and, without request, to make such as their. safety demanded. The length of time the Great Northern was in the repair shops indicated either that repairs were necessary to its safety or that "the requirements of travel" did not make it necessary to assign another sleeping car in its place. But whatever may have been the fact in that regard, the Great Northern was not, within any fair interpretation of the contract, in the possession or under the control or supervision of the defendant, or subject to be used under and for the purposes of the contract, while it was in a repair shop of which the plaintiff had the keys, and to which the defendant's employés had no access. We do not mean to say that a car, furnished by the plaintiff, ceased to be under "the dominion of the contract" while it was being repaired as provided for in the contract. On the contrary, if the Great Northern had

been destroyed by fire, the result of accident or casualty, while in the possession of the defendant, undergoing ordinary repairs, it would have been liable for the loss. No doubt the defendant's assent to liability for losses or damages resulting from accident or casualty, was because the agreement contemplated that the cars furnished to and held by it under the contract would be, all the time, — whether they were on its road in actual service or in its shops undergoing repairs, — in its immediate possession and control, thereby insuring the safety of the cars, so far as the vigilance of its own employés was concerned, from loss or damage from the causes named. But the Pullman Company became dissatisfied with the manner in which the repairs were made by the defendant, and undertook itself to make such repairs, in a shop set apart to it for that specific purpose, and placed under its exclusive control, and to which the defendant's agents had no access. The defendant agreed to be liable for loss or damage, from accident or casualty, if the loss occurred while the cars were in its possession, subject to be used by it or subject to its control, care and supervision ; but not otherwise. That is the meaning of the contract. Looking at the whole agreement, and giving full force to all its provisions, the defendant cannot be held to have agreed to be liable for loss or damage accruing from accident or casualty, while the cars were in the exclusive possession and subject to the entire control of the plaintiff, and not subject to be used, controlled or cared for by the defendant, until the plaintiff chose to surrender its exclusive possession, and return the cars to the possession and control of the railroad company. Upon the theory sanctioned by the court below, we do not perceive but that the defendant would have been liable for the loss of the Great Northern, if it had been removed to the shops of the Pullman Palace Car Company at Pullman, Illinois, to be repaired, and, after being there from October, 1881, until May, 1882, had been burned up while in those shops — a result that surely could not have been contemplated by the parties. In our opinion, the evidence did not disclose a case of liability under the contract, upon the part of the defendant, for the destruction by fire of the Great

Northern; and an instruction to the jury to that effect would not have been improper.

*The judgment is reversed and the cause remanded for a new trial in conformity with this opinion.*

MR. JUSTICE BLATCHFORD did not sit in this case or take any part in its decision.