## TERMINAL WAREHOUSE CO. OF BALTIMORE CITY v. UNITED STATES et al.

District Court, D. Maryland. April 10, 1929.

No. 1472.

952

James W. Carmalt, of Washington, D. C., and R. E. Lee Marshall, of Baltimore, Md., for Terminal Warehouse Co. of Baltimore City.

Elmer B. Collins, Sp. Asst. Atty. Gen., Wm. J. Donovan, Asst. Atty. Gen., and Amost W. W. Woodcock, U. S. Atty., of Baltimore, Md., for the United States.

J. Stanley Payne, of Washington, D. C., for Interstate Commerce Commission.

John J. Hickey, of Washington, D. C., for McCormick Warehouse Co.

Before PARKER, Circuit Judge, and SOPER and COLEMAN, District Judges.

SOPER, District Judge. The Terminal Warehouse Company of Baltimore filed a bill in equity in this case, under the provisions of the Act of October 22, 1913 (38 Stat. 219; 28 USCA § 47), to enjoin and set aside an order of the Interstate Commerce Commission of November 22, 1928. The order required the Pennsylvania Railroad Company to cease and desist from publishing or making allowances to the warehouse company for the performance of terminal services in connection with the loading and unloading of carload package freight at Baltimore (except hay, straw, and flour at its hay and flour warehouses), and to cancel tariff provisions which make the Terminal warehouses a part of the railroad's station facilities in that city. The

order was designed to remove what the Commission considered an unjust discrimination in favor of the Terminal Warehouse Company and against the McCormick Warehouse Company, also of Baltimore. It was provided by the Commission that the order should become effective on or before January 10, 1929, but this date was subsequently postponed to April 12, 1929.

The parties in the case before the Commission were the McCormick Warehouse Company, complainant, and the Pennsylvania Railroad Company, respondent. The Terminal Warehouse Company was allowed to participate as intervener. The present case was brought by the Terminal Warehouse Company against the United States, the Interstate Commerce Commission, and the Pennsylvania Railroad Company, and the McCormick Warehouse Company has been allowed to intervene. The two warehouse companies are competitors in the merchandise warehouse business in Baltimore. They receive shipments of merchandise over the railroads entering Baltimore for storage or distribution, and attend to shipments of merchandise from their respective warehouses over the railroads to points outside of Baltimore city. The case turns upon the complaint that the Pennsylvania Railroad Company, in violation of sections 2 and 3(1) of the Interstate Commerce Act, as amended (41 Stat. 479; 49 USCA §§ 2, 3(1), pays to the Terminal Warehouse Company, as an allowance, 35 cents per net ton on freight received by and forwarded from its warehouses in Baltimore, but refuses to make a similar allowance to the McCormick Warehouse Company on freight received by or forwarded by it. Speaking broadly, it is the contention of the Terminal that the sum so paid constitutes compensation for transportation services rendered by it to the carrier in loading and unloading freight, whereas the McCormick Warehouse Company asserts that, while the services paid for are ostensibly rendered to the carrier, they are in reality performed for the benefit of the owners of merchandise intrusted to the warehouse for storage or distribution.

Consideration of the question involved began in 1921, when it was brought to the attention of the Commission by informal correspondence. Subsequently, on November 28, 1923, a formal complaint was filed by the McCormick Warehouse Company against three carriers, namely, the Pennsylvania Railroad Company, the Baltimore & Ohio Railroad Company, and the Western Maryland Railway Company. It was shown that each of them made payment of similar allowances upon carload shipments to a preferred warehouse in Baltimore. The Baltimore Chamber of Commerce and the Philadelphia Chamber of Commerce were allowed to intervene in defense of the practice. A report and an order of the Commission, filed January 12, 1925 (95 I. C. C. 301), directed the dismissal of the complaint. But on March 21, 1927, the matter was reopened upon the petition of the McCormick Warehouse Company, and a report was filed November 22, 1928 (148 I. C. C. 299), in which the Commission reversed its former holding and passed the order which is the subject-matter of this suit. The testimony taken in these cases has been filed as part of the record in the case at bar, and, when considered in connection with the findings of the Commission in its two reports, discloses the situation hereinafter described.

Rule 27 of the Consolidated Freight Classification, applicable to railroad carriers, which has been in effect for a long time throughout the United States, provides that carload traffic carried at carload rates shall be loaded and unloaded by the shippers or owners. The most common, if not the standard, form of delivery for carload freight is the setting of the car on the so-called team tracks of the carrier, where it can be conveniently unloaded by the consignee. A common substitute for team track delivery is the switching of a car to the private siding of a consignee, whose place of business is contiguous to the trunk line of the carrier clear of the main track. U. S. Cast Iron Co. v. Director General, 57 I. C. C. 677, 682; Los Angeles Switching Case, 234 U. S. 294, 311, 34 S. Ct. 814, 58 L. Ed. 1319.

There are, however, exceptions to this classification applicable at a few points of shipment. A tariff published by the Pennsylvania Railroad Company and other lines serving Baltimore provides that the carriers will load and unload carload package freight through certain designated public freight stations of the carriers, without charge to shippers. This practice has been in effect for a long time, and is said to have been brought about by competition with water carriers, and by the desire to secure prompt release of equipment. It is in effect, not only in Baltimore, but also at New York, Philadelphia, and Washington, and at the time of the first report of the Commission it was also in effect at Chicago, Cleveland, Pittsburg, Buffalo, Rochester, Troy, and Green Island, N. Y. In the last-mentioned places it was subsequently canceled. Loading and Unloading Carload Freight, 101 I. C. C. 394.

The Commission said in its first report that, with the increase in the volume of package freight moving at carload rates, the carriers serving Baltimore found it to their advantage to employ additional facilities, through which the freight could be loaded and unloaded, to supplement their public freight stations and platforms, and that to this end the Pennsylvania employed the facilities of the Terminal Warehouse Company. The Terminal commenced to operate warehouses in 1893 or 1894, since which time, under contracts with the Pennsylvania, it has received compensation from the carrier for loading and unloading carload freight at its warehouses. The second report shows that the warehouses operated by the Terminal are generally referred to as the Monument Street Stores, the Flour, the Hay, and the Bond Street Warehouses. With regard to hay and flour, the Commission said that the record was not sufficient to warrant a finding in respect to the lawfulness of the allowances paid for loading and unloading shipments at the hay and flour warehouses, which appeared to be the carrier's only stations for the receipt and delivery of such commodities at Baltimore, and therefore these allowances were not further referred to or considered.

The tariff of the Pennsylvania Railroad Company containing the exceptions to rule 27 declares that package freight in carloads, carried at carload rates, received or delivered at designated stations in Baltimore, will be loaded into and unloaded from cars by carriers, and follows this statement with the designation of five stations, including Calvert Station. It is further declared that Calvert Station includes the facilities of the Terminal Warehouse Company. As a matter of fact, none of the Terminal's warehouses adjoins the Calvert Station. The Monument Street Stores are nearest Calvert Station, but several business concerns are located between the two. The Bond Street Warehouse and its annex appear to adjoin the Jackson Wharf Station of the carrier, but are about two miles from Calvert Station. The land on which all of the warehouses are located, and the Monument Street Stores and Bond Street Warehouse, are owned by a subsidiary of the carrier and leased to the Terminal. The same subsidiary owns one-third of the Terminal's capital stock.

The Terminal handles a very large quantity of freight. For a representative period, the Terminal loaded and unloaded about 20 per cent. of all carload package freight shipped to and from Baltimore over the carrier's lines, including package freight handled from and to team tracks and private sidings. From February 20, 1926, to June 30, 1927, the Terminal handled 9,548 cars, of which 8,603 were inbound and 945 outbound, on all of which it received allowances from the carrier. The allowances in February, 1927, were $3,600.61 and in March, 1927, $4,415.14.

The services for which the allowances were paid are thus described in the first report: "The service for which the allowance is made includes loading, unloading, sending notice of arrival of shipment to the consignees, holding and insuring the freight for not exceeding 48 hours' free time, collecting freight charges, taking receipts from consignees for shipments, and handling incidental matters pertaining to claims."

The McCormick Warehouse Company, at the time of the Commission's first report, operated three warehouses in the industrial districts of Baltimore, but in the interval between the two reports was obliged to sell one of them. One of the remaining warehouses is not served by the rails of any carrier. The third is served by the Municipal Harbor Belt Railroad, a line which is operated by the Baltimore & Ohio Railroad for the city of Baltimore, and renders switching services for the trunk lines serving Baltimore at their expense. This warehouse is modern, well equipped, and amply able to handle and store merchandise in large quantities, with adequate side tracks and platforms to accommodate cars. But the McCormick Warehouse Company is materially handicapped in its endeavor to get business by the payment which the Terminal Warehouse Company receives from the Pennsylvania Railroad Company. In order to meet the comparatively low aggregate charge which the Terminal is thus enabled to make, the McCormick must either shrink its prices by the amount of the allowance or stand the risk of losing the business. In many instances, the McCormick has in fact lost customers because of the advantage which the Terminal enjoys. The Chambers of Commerce naturally desire to maintain the benefits which the large number of shippers using public warehouse service derive from this situation, but there is, of course, no benefit to shippers who maintain private sidings and are required to load and unload cars at their own expense.

The character of the services rendered by the competing warehouses to their customers is an important consideration in this case. Each company engages in active solicitation of shipments from distant points to its warehouse. The greater part of the business is done by contract or arrangement with manu-

facturers and wholesalers outside of Maryland, in which goods in carload lots are shipped to Baltimore and there stored, or distributed and reshipped in less than carload lots by rail, truck, or other means. The Terminal makes no charge if a carload is separated into four or less lots. The average number of such separations is eight or ten. Evidence presented before the Commission for the first time at the second hearing shows that, since the Great War, the service which the public warehouse renders has been materially changed, and constitutes a much greater factor than formerly in the distribution of goods. Before the war, a warehouseman customarily received large consignments of many carloads of single commodities to be stored for delivery throughout the remainder of the year; but to-day it is more customary for the manufacturer to ship one carload of a single product. Sometimes there are many different commodities in one car. Instead of storing these carloads, frequently a portion of the load is immediately distributed and delivered or reshipped upon arrival, and the remainder is placed in storage as spot stock against which the owner or broker will draw on short notice to meet the demands of his customers. The warehouse companies also issue warehouse receipts, provide insurance, recoopering, marking, and separation of varieties, and clerical services, such as invoicing when reshipment occurs. The warehouseman makes daily reports to customers of the condition of their stock. In many instances it collects empty containers and ships them back to the manufacturer in carload lots.

It will be observed that the service thus rendered to manufacturers and shippers benefits them in at least two important particulars. It permits shipment of a variety of goods in carload lots belonging either to one owner or to a number of owners, and destined to a number of customers, and it affords a means by which the goods upon arrival may be stored and distributed. It is provided by rule 23 of the Consolidated Freight Classification that carriers' agents must not act as agents of shippers or consignees for the assembling or distribution of carload or less than carload freight, and that carriers' agents at points of shipment must not accept freight to be carried at carload rates for distribution to two or more parties by carriers' agents at points of destination. The agents at these points must deliver carload freight to one consignee only, and must not accept orders from shippers or consignees to split deliveries. Indeed, if a carload shipment is delivered to more than one consignee, at the request of the owner of the property, less than carload rates are applied on the entire shipment, except the portion delivered to any one consignee. Now it is not practicable in most cases to distribute the contents of a car at the carrier's freight station, by reason of the unavoidable delay and expense involved in making delivery to a number of distributees. Hence the merchandise warehouse performs an essential function for a great number of shippers. The saving in freight charges by shipping by the carload as compared with less than carload lots is very great. Oftentimes it is enough to pay all the warehouse charges on the goods.

When the first case was on trial before the Commission, the contention was made that the Terminal could not lawfully act both as agent of the shipper and agent of the carrier in regard to the same transaction; but the Commission held that the two agencies were for different transactions. It said that the agency for the railroad included unloading, sending of notices, collection of freight charges, etc., and that for the shipper included storage after free time, separation of traffic, etc. The Commission cited Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 S. Ct. 22, 56 L. Ed. 83, for the rule that an allowance to a shipper or receiver of freight for services rendered to the carrier in connection with the transportation is not unlawful, provided the allowance is not more than is just and reasonable. Referring to instances in which, as the record indicated, allowances had been made to the Terminal for unloading shipments of which it was the consignee, or for loading shipments of which it was the consignor, the Commission said that such allowances must be published and filed with it and made available to all shippers furnishing a like facility, or performing a like service of transportation in connection with their traffic.

During the first hearing, the McCormick Warehouse Company definitely stated that it was not in any sense a shipper or receiver of traffic, unless it was named inadvertently as consignee or consignor. By reason of this concession, the Commission held that the McCormick Warehouse Company was not entitled to complain of discrimination. The Commission said: "When consideration is given to the assertion of complainant that it is not a shipper or receiver of freight, the conclusion must be reached that it has no relation with a common carrier which could result in a discrimination against it in violation of the Interstate Commerce Act. The

discrimination there forbidden is in respect of transportation. Pittwood v. N. P. Ry. Co., 51 I. C. C. 535. No unjust discrimination or undue prejudice of the traffic handled through complainant's warehouses has been shown to exist."

■■■ The authorities do show, as the Commission held, that in certain cases it is proper for a shipper or forwarder of goods to be paid for transportation service rendered to a carrier. See Interstate Commerce Commission v. Diffenbaugh, supra, which was referred to in Lehigh Valley R. R. Co. v. United States, 243 U. S. 444, 37 S. Ct. 434, 61 L. Ed. 839, as being an authority which went to the verge of what is permitted by the Act to Regulate Commerce. It is also well settled that a carrier has full liberty to select its own agents to perform transportation service on its behalf, which it is under legal obligations to perform, and that it may employ one agent exclusively, and refuse to employ another. Covington Stock-Yards v. Keith, 139 U. S. 128, 11 S. Ct. 461, 35 L. Ed. 73; Express Cases, 117 U. S. 1, 6 S. Ct. 542, 628, 29 L. Ed. 791; Chicago, etc., R. R. v. Pullman Southern Car Co., 139 U. S. 79, 11 S. Ct. 490, 35 L. Ed. 97; Donovan v. Pennsylvania Co., 199 U. S. 279, 26 S. Ct. 91, 50 L. Ed. 192.

The Pennsylvania Railroad and the Terminal Warehouse Company, after the first report of the Commission, made no effort to show that under these rulings it is proper for the railroad to pay the warehouse for loading and unloading of cars on the premises of the latter, even though it be the consignor or consignee of the goods. The carrier met the situation suggested by the first report of the Commission by amending its tariff on February 20, 1906, so as to provide that no allowance would be paid to the Terminal on any traffic consigned to or by it. The Terminal, on its part, issued instructions to its patrons that they should in the future bill their shipments to themselves as consignees in care of the Terminal, stating that shipments in the name of the Terminal were considered by the Commission as evidence that the merchandise belonged to the warehouse. In short, the parties seemed to concede the impropriety of the allowance on cars so consigned. In actual practice, the billings subsequently employed varied considerably. In some shipments the entry on the documents under the head of "consignee" consisted of the name of the owner, followed by the name and location of the particular warehouse to which delivery was desired. In other cases, the name of the owner, together with the initials of the warehouse or the name of the owner, followed by the notation "to or for" a specified warehouse of the Terminal, was used. ·

When the McCormick Warehouse Company filed a petition for a rehearing of the matter on March 24, 1927, it amended its complaint so as to eliminate therefrom the Baltimore & Ohio Railroad Company and the Western Maryland Railway Company, confining the issue to the relationship between the Pennsylvania Railroad Company and the Terminal Warehouse Company. It also amended its complaint so as to show (contrary to its statement in the prior trial) that, in the conduct of its business, it shipped package freight in carloads from its warehouse in Baltimore to points in other states, and also shipped similar freight from various points outside of Maryland for delivery to the warehouse. It alleged that the Terminal Warehouse made similar shipments. After a reconsideration of the matter, including additional testimony taken subsequent to the first report, the contentions of the complainant were sustained.

■ The new report differs from the earlier one in two important particulars and therefore prevails over it. New England Division Case, 261 U. S. 184, 203, 43 S. Ct. 270, 67 L. Ed. 605. The Commission found in the first place that the Terminal Warehouses were not in truth and in fact public freight stations of the carrier, and in the second place that both the Terminal and the McCormick Companies occupied substantially the position of consignor or consignee in regard to merchandise shipped from or to their respective warehouses. On the first point the Commission said: "While the warehouses of the Terminal are nominally open to the general public, to be used as freight stations for receiving and forwarding freight, the record does not show that they are used by others than those who employ the Terminal to store, distribute, or perform some warehouse service in connection with their goods."

This conclusion was based, not merely upon the fact that no goods are shipped to or from the warehouse unless the Terminal is employed to perform some warehouse service in connection with them, but also upon the contents of the contracts between the carrier and the warehouse under which the allowances are paid. These documents obligate the Warehouse Company to accord to traffic passing over the carriers' lines preference in the use of the Warehouse Company's facilities over traffic passing over other lines, and require the warehouse not to extend its facilities to such traffic without the consent of the car-

rier. The contracts further provide that, if the Warehouse Company should pass into the hands of interests hostile to the carrier, the agreements, at the option of the carrier, shall cease and determine upon 30 days' written notice. The carrier also reserves the right upon 60 days' notice to determine the allowance, if it should cancel similar allowances in respect to other warehouses in seaboard cities on its system. These provisions, the Commission found, insured the carrier a line-haul movement on all traffic shipped to or from the Terminal Warehouse. The Commission further showed that, although the Terminal had received the allowance since 1893, the carrier's tariffs had only provided that the warehouses should be included within its station facilities since July 1, 1918, indicating that prior to that date it was not intended that the warehouses should be used by the general public as stations. At no time have they been used by the public generally, but only by patrons of the Terminal. Taking all these matters into account, the Commission held that traffic considerations were the primary considerations for the payment of the allowance by the carrier. In short, the finding was that the platforms and warehouses of the Terminal have been used exclusively for its own business activities.

Secondly, the Commission reached a different conclusion as to the consignment of the merchandise. So far as the McCormick Warehouse Company was concerned, the finding was based upon a concession that the company acted both as consignor and consignee of the goods which it handled. As to the Terminal, it was strenuously contended before the Commission and in this court that the Warehouse Company is neither shipper, consignor, nor consignee of the goods which it handles, but that, on the contrary, the shipping documents and the instructions given to the owners of merchandise indicate an intention that the Warehouse Company shall have no such legal relationship to the shipments. The Commission, however, reviewing the circumstances under which the form of the shipping documents was changed after its first report, said:

"Defendant insists upon the legality of the allowance where the Terminal is not named in the billing as consignee, while conceding that allowances should not be paid when the Terminal is named as the consignee. It is inconceivable that the form of the billing alone should determine the true status of the parties with respect to the transportation, or the obligations of defendant as a common carrier. As a matter of substance all shipments to the Terminal's warehouses are handled exactly the same and the true status of the parties respecting the transportation is exactly the same. * * * While the Terminal is not the owner of the goods received and shipped by it, all of the dealings of defendant are with the Terminal and none with the owner of the goods. As to many of the inbound shipments the Terminal is the only party to whom delivery of the goods could be made as carload shipments, the real owners being out-of-town concerns which ship to the Terminal for distribution in less than carload lots. It is our view that the Terminal, even though not the owner of the goods, has been given dominion over such goods for transportation purposes, and that accordingly for transportation purposes it should be deemed to be the consignor of shipments from and consignee of shipments to its warehouses. The same is true as to complainant, shipments to its warehouse being handled in substantially the same manner."

The Commission therefore concluded that the practice of the Pennsylvania Railroad in making allowances to the Terminal for loading and unloading carload package freight at its warehouse, and refusing to make similar allowances to the McCormick Warehouse Company for performing similar service, resulted in unjust discrimination, undue preference to the Terminal, and undue prejudice to McCormick. It therefore passed the order which is the subject-matter of this suit.

■■■ The contention of the Terminal Warehouse Company is that the Commission's order is wrong, because the Warehouse Company has been designated in the tariff as a public station of the carrier, and hence in this place the carrier is obliged, under the exception to rule 27, to load and unload carload freight, and may employ and pay the Terminal as its agent to do the work. But the conclusion to which the Commission came destroys the essential premise upon which this argument is based; for it found that the Terminal Warehouses, although nominally open to the general public, are in fact confined to the receipt and forwarding of merchandise concerning which the Terminal is employed to render some warehouse service. We are bound by this conclusion of fact, if it is supported by substantial evidence. Anchor Coal Co. v. U. S. (D.C.) 25 F. (2d) 462, 471. In our opinion, the evidence not merely supports, but requires, the conclusion which the Commission has reached. It is true that 20 per cent. of all carload package freight, shipped to Baltimore over the Pennsylvania, is handled by the Terminal Warehouse, and that any ship-

per, desiring warehouse facilities, may send his goods to its platform. But these circumstances do not constitute the warehouse a public station. It is not used by shippers or consignees, who do not require or desire the services of the Terminal Warehouse Company, and either do not make use of any warehouse, or send their goods to other warehouses of a private or public character. The distinction between this situation and that in the case of U. S. v. Baltimore & Ohio Railroad, 231 U. S. 274, 34 S. Ct. 75, 58 L. Ed. 218, upon which the complainant relies, is obvious; for there the premises used by the carrier as a freight station, although furnished and operated by a nearby shipper, who used it to a greater extent than any other shipper, was nevertheless open to all shippers and actually used for the benefit of all alike.

[6, 7] What has been said is sufficient to dispose of the main question in this case; but there are additional grounds to support the position of the Commission. Considerable discussion in this case has revolved around the query whether the Terminal's loading and unloading services are transportation services, rendered to the carrier, or warehouse or trade services, rendered to the owner of the goods. There is much to be said for the latter contention, because the loading and unloading of freight on the private sidings of private warehouses and of public warehouses, other than the Terminal, is customarily done as part of the warehouse business. But the matter need not be further considered, for if it be conceded, as the complainant contends, that the services are rendered for the carrier, it follows that an unlawful discrimination and a violation of the tariff have taken place. The carrier may not render such services, either by itself or through an agent, except at a public station. Certain other services rendered by the Terminal to the carrier have been quoted from the Commission's first report, but it is obvious that they have no substantial existence apart from the handling of the goods. Since the warehouse acts as the agent of the owner in receiving the goods, it is quite clear that the sending of notice of arrival of the shipment to interested parties in Baltimore after the warehouse has received notice of arrival of the car from the railroad, the collection of freight, and other incidental matters are in fact performed for the benefit of the owner of the goods, and do not justify the payment of the allowance by the carrier.

The Terminal Warehouse Company is inclined to consider the legality of its arrangement with the carrier, not so much with respect to the character of its warehouse as a public freight station, but rather from the standpoint of the relationship which the Warehouse Company sustains to the shipment and transportation of the goods. Its main argument is that it has no legal relation to the property or interest in the merchandise shipped to or from its warehouses as to give it any dominion over the merchandise for transportation purposes. The contention seems to be that the allowance paid to it has no relation to the contract of shipment, and is therefore outside the purview of the terms of the Interstate Commerce Act. But it is not a sufficient answer to say that the allowance is not paid to the shipper or consignee. In any event, it is paid by the carrier for a service rendered to the shipper's goods, and unless the service is performed for all shippers alike at the carrier's station, it may not lawfully be given, under the terms of the tariff or of the act of Congress. Moreover, there is no solid foundation for the assertion that the Terminal has no legal relation to or dominion over the merchandise for transportation purposes, although its name may not appear on the shipping documents as consignor or consignee. Doubtless the owner of goods by suitable shipping documents may constitute himself consignor or consignee of the merchandise, and retain title in himself as such, while employing an agent at the point of destination or shipment to make necessary arrangements with the carrier. But it does not follow that such an agent is so completely separated from the carriage of the goods that dealings between him and the carrier are outside the scope of the statutes designed to secure like privileges to all shippers.

We have discussed in some detail the business operations of warehouse companies, so as to make clear the numerous ways in which they come in contact with the carrier in the transportation of goods. We have seen how the shipments of goods over a particular line are stimulated by the solicitation of the warehouse company, and how closely it is identified with the receipt and delivery of the goods upon arrival. In fact, the handling of inbound and outbound freight by the Terminal for the benefit of the owners of the merchandise is substantially the same in all material respects as that performed by a private warehouse or a public warehouse which does not have the preferred status. Carloads of inbound freight, when received, are placed upon the private side track of the warehouse, which signs the delivery receipt, unloads the goods, releases the car, and pays the freight. For outbound shipments, the Warehouse Compa-

ny orders the railroad to place the car on its private siding, loads it, prepares the bill of lading and shipping order, prepays the freight, and turns the car over to the carrier for shipment and delivery. The evidence of the carrier's employees in the case at bar shows that, after an inbound car is placed on the private siding of the warehouse, the carrier has nothing further to do with it, except later to collect the freight charges from the warehouse, and in regard to outbound shipments that the carrier knows nothing about them until the goods are loaded into the car and turned over to the railroad. It is obvious that there is no substantial difference between these transactions and those between the carrier and a private warehouse upon its own private siding, except that in the case of the Terminal the freight is loaded and unloaded at the expense of the carrier.

But the Terminal says it is in a different situation, because it is not named as consignor or consignee in the shipping document; and Bills of Lading Act, 39 Stat. 545, § 42 (49 USCA § 122), provides that, unless the context otherwise requires, consignor and consignee mean persons appropriately described in the bill. The Warehouse Company has taken great pains to instruct its patrons to bill their shipments to themselves. Nevertheless it was shown at the second hearing before the Commission that 321 cars had been billed to the Terminal in conflict with these instructions. When this situation was disclosed, the Terminal refunded the allowance on 120 carloads which were consigned to it, but disputed the right of the carrier to a repayment of 191 carloads consigned to the Terminal for delivery to other persons. But it is obvious that this is a matter of form rather than of substance. It is well settled that the actual situation underlying a shipment rather than recitals in the shipping documents should control in the application of the acts of Congress, B. & O. R. R. v. U. S. (Com. Ct.) 200 F. 779, 789, 791; T. & N. O. R. R. v. Sabine Train Co., 227 U. S. 111, 127, 33 S. Ct. 229, 57 L. Ed. 442; and it is clear that Congress did not intend to alter this rule by the Bills of Lading Act. We agree with the Commission that it is inconceivable that a mere alteration in the name of the consignee in shipping documents can justify a course of action which would otherwise be contrary to law.

We think that the decisions of the Supreme Court cases in which it is held that carriers may not lawfully discriminate for or against forwarders of goods are pertinent to this case. See I. C. C. v. Delaware, L. & W. R. R. Co., 220 U. S. 235, 31 S. Ct. 392, 55 L. Ed. 448; Lehigh Valley R. R. Co. v. U. S., 243 U. S. 447, 37 S. Ct. 434, 61 L. Ed. 839. Both the warehouse and the forwarder solicit and obtain the transportation of goods. The forwarder is concerned with the assembling of goods into carload lots at the point of shipment and the carriage of the same to one consignee, who may be the forwarding agent himself, and who receives the goods and distributes them to the parties for whom they are intended. The warehouseman is chiefly concerned with the receipt and distribution of goods from the carrier after they have reached their destination. It is true that the forwarder is usually the consignor or the consignee of the goods, and it may be conceded arguendo that the warehouse company in this case is not. But both are closely related to the carriage of the goods and to the carrier, and both are entitled to the protection of the statute. We think that the allowance by the Pennsylvania Railroad Company to the Terminal Warehouse Company in this case, and the refusal of the carrier to make a similar allowance to other public merchandise warehouses, constitute an undue and unreasonable preference and advantage to one corporation, and an undue prejudice and disadvantage to the others, and are as obnoxious to section 3(1) of the act (49 USCA § 3(1) as were the actions of the carrier which discriminated for or against forwarders in the cases cited. Moreover, the discrimination benefits not merely the Warehouse Company, but also the owners of the goods intrusted to its care.

We think, also, that the allowance constitutes a rebate in violation of section 2 of the act (49 USCA § 2). It benefits both the warehouse company and its patrons, and may fairly be said to constitute a device by which the carrier indirectly receives from them a less compensation for services rendered than it demands and receives from other persons for like service in the transportation of like goods under substantially similar circumstances.

The bill of complaint will be dismissed.