BAKER WHITELEY COAL CO. v. BALTIMORE & O. R. CO.

(Circuit Court, D. Maryland. February 9, 1910.)

MONOPOLIES (§ 16*)—VALIDITY—GRANT OF EXCLUSIVE PRIVILEGE TO DOCK VESSELS AT WHARF.

A contract made by a railroad company, which was a large carrier of coal to the seacoast at Baltimore, and which had there built a private pier for exclusive use in loading coal from its cars upon vessels for water transportation, by which it gave to a tug owner the exclusive right to dock and undock vessels at such pier, in consideration of which the tug owner agreed to keep one or more tugs on hand at the pier at all times to perform such service as required and to render assistance in case of fire, is not unlawful as against other tug owners, it being shown that it facilitated the use of the pier by itself and shippers, and did not add to the charges of the latter or their consignees.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 16.*]

In Equity. Suit by the Baker Whiteley Coal Company against the Baltimore & Ohio Railroad Company. Decree for defendant.

Robert H. Smith, John C. Rose, and J. Craig McLanahan, for complainant.

Herbert R. Preston and R. Marsden Smith, for defendant.

Before GOFF, Circuit Judge, and MORRIS, District Judge.

MORRIS, District Judge. This is a bill in equity filed by the Baker Whiteley Coal Company, a corporation of West Virginia, against the Baltimore & Ohio Railroad Company, a corporation of Maryland, praying an injunction restraining the railroad company from putting into effect a rule made by it by which after June 15, 1908, the docking and undocking of all classes of vessels at the railroad company's coal pier at Curtis Bay should be done exclusively by the tugs of Capt. R. M. Spedden. On the case made by the bill and affidavits, a preliminary restraining order was granted, and now, after answer filed and testimony duly taken, the case comes on for final hearing.

The Curtis Bay coal pier of the Baltimore & Ohio Railroad Company was, about 1901, built out from land of which the railroad company is the riparian owner on the navigable waters of the Patapsco river adjacent to the harbor of Baltimore. The object of its construction by the railroad company was to facilitate in the most convenient manner the loading of coal-carrying ships with the coal brought to the pier by the railroad company. There is room for from two to four ships on each side of the pier, but it is not used for any other purpose. The complainant is the owner of tugs, having a large business in towing vessels and in docking them at the coal pier. The business of the complainant is injuriously affected by the enforcement of the order complained of for the reason that the complainant makes annual contracts with vessels coming up the Chesapeake Bay and using the coal pier by which it contracts for an agreed price to meet the vessels and do all their towing, including the service of docking and undocking at the coal pier. This towing business of the complainant is large, and the part of its charges for the work of docking and undocking

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

steamers at the coal pier amounts to as much as $7,000 a year. The immediate occasion of the filing of the bill as stated in the complaint was that the Norwegian steamship Horda, in respect to which the complainant had a towing contract, had arrived in the harbor of Baltimore intending to load with coal at the coal pier, and had been towed alongside the pier by one of complainant's tugs for the purpose of being docked at the coal pier, but those in charge of the pier had refused to let the steamship come to the pier in tow of complainant's tug, and had denied to the complainant the opportunity of completing the towage service it had contracted to perform, and refused to allow the steamship to be docked except by Spedden's tug.

The answer of the railroad company alleges that the coal pier at Curtis Bay, with its large number of shifting tracks and its branch road connecting it with the railroad company's main line, was constructed for the purpose of receiving, assorting, and classifying coal cars with the least delay possible; that its operation is complex as compared with an ordinary pier, and requires for successful operation that, in assorting and arranging coal cars and sending them to the pier and in unloading the coal into vessels, every kind of delay and confusion should be avoided; that it is true that in the past vessels have employed any tugs they might choose to dock and undock them at the pier, but it was found that this practice caused delay and confusion and materially limited the capacity of the pier resulting in delay to the shippers of coal; that as a means of remedying these evils, the railroad company determined to so arrange that there should always be tugs in readiness at or about the pier for the special purpose of promptly docking and undocking vessels as soon as they were ready; that for this reason they had contracted with R. M. Spedden to keep during 12 hours of the day a tug of sufficient capacity at the coal pier, and to charge vessels for the service not exceeding the rate established by the Tow Boat Owners' Association for docking and one-half the rate for undocking. The contract also required said Spedden to keep at the pier day and night and Sundays a tug and sufficient crew for fire protection, and to perform all the service to the satisfaction of the railroad. It was made a condition of the contract that, in consideration of the fact that Spedden should keep tugs always on hand for the prompt handling of vessels, the railroad company would enforce a rule that all docking and undocking at the pier should be done exclusively by said Spedden's tugs. There does not appear to be any material dispute as to the facts except that the complainant contends that the claim that there exists any necessity or reasonable ground for such a rule is not well founded. We think the proof does lead to the conclusion that by the enforcement of the rule established by the railroad company as the owner of the pier its business will be facilitated, and the dispatch of vessels insured, by having at all times a tug at the pier ready to dock and undock vessels, and that other incidental advantages accrue from having at all times a steam tug there ready to extinguish fires, and to clear the pier of ice and move vessels as required. It does not appear that the cost to vessel owners of docking and undocking has been increased by the new arrangement. The

only parties who can be said to have a right to come to the pier are those for whom coal has been transported by the railroad, and who, as consignees or shippers, have a right to require it to be delivered to the vessels they send to the pier for it. They are not complaining or seeking redress, but a tug boat owner on his own behalf.

It is to be borne in mind at the threshold that under the Maryland law this pier is the private property of the railroad company (Maryland Code, art. 98, § 21), and in Weems Steamboat Company v. People's Company, 214 U. S. 345, 29 Sup. Ct. 661, 53 L. Ed. 1024, it was decided that a private wharf is not held by the owner subject to public use, and that a third person has no right to demand its use even on tendering compensation therefor. This ruling followed the court's previous decision in Louisville & Nashville Railway Company v. West Coast Naval Stores Company, 198 U. S. 483, 25 Sup. Ct. 745, 49 L. Ed. 1135. In the case last cited, the Supreme Court held that the fact that a wharf was built by a railroad company, and was intended for terminal purposes at a seaport, did not make it a public wharf in the sense that any one having goods to be transported by water could ship them over the railroad and use the wharf for any vessel he might select to load them for the water transportation. The rulings in these two cases would appear to sustain the contention that the pier in this case is so far under the control and regulation of the railroad company that it can determine for itself how it shall be used, and that if it sees fit to make a not unreasonable regulation determining what tugs shall be permitted to dock and undock coal vessels there, it is within its right as owner.

The testimony tends to prove, and we think does fairly establish, that the railroad company can only get the tug service most beneficial to itself and most convenient and effective to the shippers of coal by making an exclusive contract with some one to furnish the tugs and, incidentally, to have a proper tug always on hand to avoid delays and to render assistance in case of fire or other emergency. The ruling of the Supreme Court in Chicago, St. Louis & New Orleans Railroad Company v. Pullman Car Company, 139 U. S. 79–90, 11 Sup. Ct. 490, 35 L. Ed. 97, with regard to an exclusive contract of the railroad company with the Pullman Car Company would seem to be applicable in principle. It is contended that as the Curtis Bay pier is a facility offered for the use of all shippers of coal over the Baltimore & Ohio Railroad who desire to have it further transported by water, and as they have a right to send the vessels selected by them to the pier and to have the coal loaded on board, that this right implies and includes the right to use any proper and suitable tug to put the vessels in place. But we think that the docking and undocking of the vessel is a mere incident of the business, and is a matter which the owner of the pier may within reasonable limits control to subserve its own convenience and that of its shippers.

The case of Donovan v. Pennsylvania Company, 199 U. S. 279, 26 Sup. Ct. 91, 50 L. Ed. 192, was a case which received most learned consideration by the Supreme Court. In that case the Pennsylvania Railroad Company, being the owner of a passenger station and depot build-

ings in Chicago, made an exclusive arrangement with the Parmalee Transfer Company to supply all vehicles required by passengers. This arrangement deprived the hackmen of the city of the privilege they had theretofore enjoyed of entering the station to solicit employment from arriving passengers. It was held by the Supreme Court that the railroad was required under all circumstances to do what was reasonably necessary and suitable for the accommodation of passengers and shippers, but was under no obligation to refrain from using its property to the best advantage of the public and itself, and that it was not bound to so use its property that others having no business with it might make a profit to themselves. It was urged that the hackmen were themselves carriers of passengers, and were entitled to pursue their business at any place open to another carrier engaged in the same kind of business. The court denied this contention, and held that the railroad company was not bound to accord this particular privilege to the defendants simply because it had accorded a like privilege to the Parmalee Transfer Company, for it had no contractual relations with the defendants, and owed them, as hackmen, no duty to aid them in their special calling.

In the present case, although it might seem that as to arriving vessels which have been towed in by the complainant's tugs and were going direct to the coal pier it might be contended that the tug had a right to continue the towing service and take the vessel to the pier, it is a fact that this situation does not often occur, for, as a rule, the vessel that expects to load coal goes first to the coal pier anchorage, and lies there until a place is ready for her at the pier, when she is docked by a tug which does that special service. For this service of docking and undocking the rule put in force by the railroad company results in no increase of expense to the vessel.

We think the order heretofore entered restraining the Baltimore & Ohio Railroad Company from preventing the tugs of the Baker Whiteley Coal Company from docking and undocking vessels at the railroad company's coal pier at Curtis Bay should be rescinded and the bill of complaint dismissed, and it is so ordered.