Harry M. Leet and Helen A. Leet v. Commissioner.
Leet v. Commissioner
Docket No. 45032.
United States Tax Court
T.C. Memo 1955-13; 1955 Tax Ct. Memo LEXIS 328; 14 T.C.M. (CCH) 39; T.C.M. (RIA) 55013; January 24, 1955
Harry M. Leet, Esq., 2579 Bonnie Drive, Cincinnati, Ohio, pro se. A. Russell Beazley, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies of $334.34 and $239.26 in the income tax of the petitioners for 1949 and 1950, respectively. Issues raised by the pleadings are the correctness of the respondent's action (1) in disallowing a deduction for 1949 of $20.75 for taxes paid, (2) in disallowing deductions taken for 1949 as losses from casualty, or theft, the amounts of $933 for furniture damaged and stolen, $18 for broken automobile muffler and exhaust, $20 for broken automobile fuel pump, $35.80 for broken automobile starter, $250 for tree destroyed by lightning, $125 for broken septic *329 tank drain, and $60 for broken water line, (3) in disallowing a deduction of $1,353 taken for 1950 as a loss from casualty, or theft, arising from an alleged breach of implied warranty in the sale of an automobile, and (4) in failing to allow the amounts of $73 and $146 as deductions for 1949 and 1950, respectively, as business expenses incurred by travel. On brief, the respondent concedes issue No. (1). General Findings of Fact Harry M. Leet and Helen A. Leet, petitioners herein, filed joint income tax returns for 1949 and 1950 with the collector for the first district of Ohio. Harry M. Leet, sometimes hereinafter referred to as the petitioner, was a second lieutenant in the Army, and prior to and during the first part of May 1947 was stationed in Germany. During May 1947 he returned to the United States and about the end of that month or the first part of June 1947 he was released from the Army, Immediately following his release from the Army he was employed as an attorney on a full time basis by the United States Department of Labor in Washington, D.C., where he has continued to be employed. From the autumn of 1947 until the latter part of 1949 the petitioner lived in Hyattsville, *330 Maryland. He left Hyattsville in the latter part of 1949 and since then has continued to live in Gaithersburg, Maryland. Issue (2). Loss Deductions Taken for 1949 Findings of Fact Pursuant to application made about May 1, 1947, by petitioner to the Army to transport his household furnishings in Frankfurt, Germany, to the United States, representatives of the Army, on or about May 15, 1947, took custody of the property for packing and shipping. The property was shipped from Germany to New York and then transferred from there to Richmond, Virginia. In September 1947 the petitioner requested that the property be delivered to his home in Maryland. Thereafter and about October 1, 1947, it was shipped by rail from Richmond to Takoma Park, Maryland, and from there delivered to petitioner about October 10, 1947. In Frankfurt, the property was packed in seven wooden boxes, but only six of the boxes were delivered to petitioner. Items removed in an uncreated condition from the petitioner's quarters in Frankfurt, consisting of three rugs, some chairs and some smaller items, were missing upon delivery of the property to the petitioner. A number of other items had sustained damage in varying *331 degrees. On November 14, 1947, petitioner filed with the Department of the Army a claim in the amount of $1,081.16 for recovery due to damage to, or loss of, his property. On August 20, 1948, the petitioner filed a perfected claim which was prepared on a form prescribed by the Department of the Army. In the latter the petitioner sought recovery of $2,269.50 for damage to, or loss of, the same items of property involved in the claim filed on November 14, 1947. In the claim of August 20, 1948, the petitioner listed as damaged or missing at the time of delivery made to him in October 1947 a total of 145 articles of property shown as having been purchased principally in 1946 and 1947 at a total cost of $2,122.50 and practically all in new or excellent condition when delivered to the custody of the Army. Prior to August 20, 1948, the last common carrier, Baltimore & Ohio Railroad, having custody of petitioner's property when it was shipped from Richmond, Virginia, to Takoma Park, Maryland, pursuant to a claim filed by petitioner, paid him $50 to cover any damage to, or loss of, petitioner's property while being shipped by rail from Richmond. Although the petitioner filed the claim with *332 the carrier, he was of the opinion that the damage to his property did not occur through the rail shipment. Payment of the claim by the carrier was a surprise to the petitioner since it appeared to him that the carrier had ample ground for rejecting it. On December 31, 1948, the Department of the Army addressed to petitioner a letter, which was received by him subsequent to January 1, 1949, and in which he was advised that his claim for recovery for damage to, or loss of, property while being transported from Germany to the United States had been allowed in the amount of $1,125.50. The letter contained the following: "Policy established by the Department of the Army provides a means for reimbursement whereby a claimant can be reimbursed only to the extent of the actual cost price in United States currency for each individual item claimed. Accordingly, it was necessary to reduce your claim for property lost to the amount provided in paragraph 2 above. "The disapproved portion of your claim is not payable under the provisions of the 'Federal Tort Claims Act' as codified in the Act of June 25, 1948 (62 Stat. 982; 28 U.S.C. 2671), as implemented by Army Regulations *333 25-70, or any other pertinent Army Regulation, statute or appropriation available to the Department of the Army for the payment of claims." The petitioner did not file any protest with the Department of the Army respecting its action on his claim, nor did he otherwise request a review or reconsideration of its action. Nor did he institute any suit with respect thereto. In his income tax return for 1949 the petitioner took a deduction of $1,144 for "Furniture damaged and stolen while in army custody (amount disallowed by Army)." The respondent disallowed the deduction. During 1949 petitioner was returning to his home from a trip to Cincinnati, Ohio, and traveled over some temporary road work surfaced with loose limestone. Just prior to entering Zanesville, Ohio, his automobile showed signs of lack of power. At a repair station in Zanesville, he was informed that the fuel pump of the car was defective, that the station would be unable to repair it, but that the pump might "hold out" until he reached home. Petitioner resumed his trip and near Flintstone, Maryland, the motor ceased to function. The automobile was left with a mechanic at Flintstone for repairs. Petitioner and his *334 young son, who accompanied him, took a bus to complete their return home. Later when petitioner returned by bus to Flintstone to get the automobile, the mechanic expressed to him the opinion that the portion of the fuel pump which he repaired had been damaged by "some sort of a blow." The petitioner estimated cost of the fuel pump repair at $5 and the total bus fare of himself and his son from Flintstone to their home and of himself on his return to Flintstone at approximately $15. In his income tax return for 1949 the petitioner deducted $20 for a "broken fuel pump." The respondent disallowed the deduction. At some undisclosed time after petitioner brought the car home from Flintstone he had a new muffler installed on the automobile at a cost which he estimated at $18. At the time the removed muffler was taken from the automobile it had "a hole in it in the middle of a dent * * * a hole with jagged edges, and a relatively thick wall." In his income tax return for 1949 the petitioner deducted $18 for broken muffler and exhaust. Respondent disallowed the deduction. During 1949 petitioner owned an automobile called "The Prefect," which is more fully referred to hereinafter in our *335 findings as to Issue (3). The automobile was designed without a mechanism to disengage automatically the starter from the motor as soon as the motor started firing. Because of the lack of such a mechanism the starter was broken five or six times before petitioner had a mechanism installed to disengage automatically the starter as soon as the motor started firing. One of the five or six occasions on which the starter was broken occurred in 1949 when a child pressed the starter button while the motor was running resulting in damage to the starter. As a result of such damage the petitioner sustained a loss of $25. Petitioner took a deduction of $35.80 in his income tax return for 1949 on account of the damage. Respondent disallowed the deduction. In October 1949 the petitioner purchased 5 acres of land situated at Gaithersburg, Maryland, with a frontage of 360 feet on a road. The land had an old residence on it which was situated about 300 feet from the road. Between the house and the road were 15 oak trees approximately two and one-half feet in diameter and from 75 to 100 feet tall. Five of the trees were situated near the road and roughly were at equal intervals along the frontage *336 of the property. Shortly after the petitioner purchased the property one of the trees near the road was hit by lightning and killed. It was mangled to such an extent that it had to be removed and was converted into firewood. As a result of the destruction of the tree the petitioner sustained a loss of $50. The petitioner deducted $250 in his income tax return for 1949 on account of the loss of the tree. The respondent disallowed the deduction. Shortly after purchasing the property at Gaithersburg, the petitioner employed a man to plow with a tractor a plot of ground in the lawn preparatory to planting shrubbery and flowers. At that time petitioner did not know the location of the septic tank drain, nor the location of the water line. In plowing the plot of ground about 60 feet of septic tank drain was broken and the water line throughout its entire length was pulled out of the ground and was damaged to such an extent that the water had to be capped off. The petitioner had the septic tank drain repaired but never has replaced the water line. As a result of the damage to the septic tank drain and to the water line, the petitioner sustained a loss of $100. In his return for 1949 the *337 petitioner deducted $125 on account of damage to septic tank drain and $60 on account of damage to water line. Respondent disallowed both deductions. Opinion All of the deductions involved under this issue were taken by petitioner as losses from casualty or theft. On brief, petitioner contends that each of the deductions was allowable as a loss resulting from a casualty within the meaning of the pertinent provisions of the Internal Revenue Code of 1939. [1]
Respecting the deduction of $1,144 taken by petitioner for furniture damaged and stolen and disallowed in full by respondent, the petitioner her seeks the allowance of only $933 of the deduction taken. *338 As to the deduction, the respondent takes the position that any loss sustained by petitioner on account of damage to, or theft of, property placed in the custody of the Army for removal from Germany to the United States was sustained prior to 1949 and, therefore, was not an allowable deduction for 1949. The petitioner contends that the facts show that the loss in question was sustained in 1949. In considering the question of whether a loss was in fact sustained in a given year, the Supreme Court in Boehm v. Commissioner, 326 U.S. 287, said: "Such an issue of necessity requires a practical approach, all pertinent facts and circumstances being open to inspection and consideration regardless of their objective or subjective nature. As this Court said in Lucas v. American Code Co., 280 U.S. 445, 449, [50 S. Ct. 202, 203, 74 L. Ed. 538, 67 A.L.R. 1010], 'no definite legal test is provided by the statute for the determination of the year in which the loss is to be deducted. The general requirement that losses be deducted in the year in which they are sustained calls *339 for a practical, not a legal, test.' "The standard for determining the year for deduction of a loss is thus a flexible, practical one, varying according to the circumstances of each case. The taxpayer's attitude and conduct are not to be ignored, but to codify them as the decisive factor in every case, is to surround the clear language of § 23(e) and the Treasury interpretations with an atmosphere of unreality and to impose grave obstacles to efficient tax administration." Whatever portion of the petitioner's property may have been stolen and whatever may have been the damage to the remainder, the theft and the damage actually occurred in 1947. In November 1947 the petitioner filed claim for $1,081.16 with the Department of the Army. On some undisclosed date, he also filed claim with the common carrier for an undisclosed amount, but apparently for at least $50. The latter amount had been paid on the latter claim by August 20, 1948, when the petitioner filed a perfected claim in the amount of $2,269.50 with the Department of the Army. By the close of 1948 the Department of the Army had taken final action on the petitioner's claim and had allowed $1,125.50 of the amount thereof. *340 Since petitioner never protested to, nor sought any reconsideration by, the Department of the Army of its action in allowing only a portion of the claim and since petitioner conceded at the hearing that in filing claim with the Department of the Army he waived right to bring suit in the matter, it is apparent that by the end of 1948 the extent to which the petitioner would be compensated was definitely established. Likewise the extent of any loss sustained by him also was definitely established by the end of 1948. In Commissioner v. Harwick, 184 Fed. (2d) 835, affirming an unpublished decision of the Tax Court, the taxpayer sustained a loss as a result of a shipwreck which occurred in 1943 and claimed the right to be compensated therefor by insurance. The insurers neither admitted nor settled their liability until 1944, when partial liability was admitted and satisfied. It was held that 1944 was the year of the loss since prior to 1944 it was not determinable whether or to what extent the taxpayer had a right to be compensated for the damage which had occurred. Until 1944 the existence of the loss was, as to the taxpayer, still an open question. We think the rationale *341 of the Harwick case is applicable here. Accordingly, we conclude that such loss as petitioner sustained with respect to the property here involved was sustained in 1948. Consequently, no deduction is allowable with respect thereto for 1949. The next question is whether the deductions taken by petitioner on account of an automobile muffler and exhaust, an automobile fuel pump and an automobile starter were, as here claimed by him, allowable as casualty losses within the meaning of section 23(e)(3) of the 1939 Code. In Ray Durden, 3 T.C. 1, we had occasion to consider the meaning of the term "casualty" and there said: "Under the doctrine of ejusdem generis, it is necessary to define the word 'casualty' in connection with the words 'fires, storms, shipwreck' immediately preceding it. 'Casualty' has been variously defined, including 'an undesigned, sudden and unexpected event' - Webster's New International Dictionary; also as 'an event due to some sudden, unexpected or unusual cause' - Matheson v. Commissioner, 54 Fed. (2d) 537. The term 'casualty' 'excludes the progressive deterioration *342 of property through a steadily operating cause.' Fay v. Helvering, 120 Fed. (2d) 253; also, 'an accident or casualty proceeds from an unknown cause or is an unusual effect of a known cause. Either may be said to occur by chance and unexpectedly.' Chicago, St. Louis & New Orleans Railroad Co. v. Pullman Southern Car Co., 139 U.S. 79. * * * It thus appears that a proper definition of the term casualty does not exclude the intervention of human agency * * * and the prime element is that of suddenness as opposed to some gradually increasing result. * * *" Petitioner takes the position that the evidence shows that the necessity for the repairs to the fuel pump and replacement of the muffler and exhaust was due to damage thereto sustained from flying stones while driving over the temporary road work prior to entering Zanesville, Ohio. Although the evidence shows that the mechanic at Flintstone, Maryland, who repaired the fuel pump expressed the opinion that it had been damaged by some sort of a blow, there is nothing to indicate what his opinion was as to what kind of an object possibly administered the blow, or as to about when the blow might have occurred, *343 whether recently or at some remote time in the past. Petitioner stated that about the time he noticed that the fuel pump was functioning improperly he also observed that the muffler was not functioning properly. Although the record shows that petitioner had the fuel pump repaired at Flintstone, it is silent as to the condition of the muffler at that time and afterwards until at some undisclosed later time after petitioner returned home when a new muffler was installed. Nor does any explanation appear of record as to why, if the muffler was functioning improperly when petitioner reached Flintstone, a new muffler was not installed at that point. We are not informed as to how long petitioner had owned and used the car or whether it was a new or used car at the time he acquired it or its condition at the time acquired. So far as shown, the car may have been in a damaged condition when petitioner acquired it and his subsequent use of it caused it progressively to deteriorate to the point where it would not operate without the replacements and repairs in question. In the state of the record we are unable to find as petitioner contends that flying stones on the temporary road work caused *344 the damage which necessitated the replacements and repairs in question. Relying on his statement that the trip from his home to Cincinnati and return was a business trip, the petitioner contends that the deductions taken with respect to the muffler and exhaust and the fuel pump were also allowable as business expenses. While it is true that the petitioner stated that the trip was "a business trip," there is nothing of record to indicate that the trip was in pursuance of petitioner's employment by the United States Department of Labor in Washington, D.C., nor is there anything to indicate that he was otherwise engaged in any business or employment in connection with which the trip was made. Such being the state of the record, we are not in any position to conclude that the purpose of the trip was such as to justify a holding that the expenditures made by petitioner for replacements or repairs to the muffler and exhaust and the fuel pump and for bus fare for petitioner and his young son were deductible as business expenses. We think the facts presented with respect to the damage resulting to petitioner's automobile starter from a child pressing the starter button establish that the *345 loss thereby sustained was a casualty loss. So far as appears, petitioner kept no record as to the expenditure made by him for repairing the starter. However, he expressed the opinion that it was about $35. From the meager evidence bearing on the point and applying the rule of Cohan v. Commissioner, 39 Fed. (2d) 540, we have found that petitioner sustained a loss of $25 on account of the damage. That amount was deductible as a casualty loss. The next question for consideration is whether the petitioner sustained a casualty loss and, if so, the amount thereof, as a result of the destruction by lightning of an ornamental tree on the lawn of his residential property at Gaithersburg. Obviously, such destruction was a casualty. Consequently, any loss arising therefrom was a casualty loss. It has been held that where a casualty loss has been sustained with respect to ornamental trees on residential property, the amount of the deductible loss is the difference between the value of the residential property immediately preceding the casualty and the value after the casualty, but not *346 in excess of an amount equal to the adjusted basis of the property. Buttram v. Jones, 87 Fed. Supp. 322, and cases there cited. Here, the petitioner has not submitted any evidence as to the value of the residential property either before or after the destruction of the tree. Nor has he shown the cost or other basis of the property in his hands. Petitioner contends that he sustained a loss of $250 as a result of the destruction of the tree and in support of that position relies on his opinion and testimony to that effect. Such testimony was based on what he said he had been told by a nurseryman as to the cost of planting a smaller tree to replace the destroyed tree. In the foregoing state of the record we can not find that petitioner has shown that he sustained a deductible loss of $250. Petitioner kept no record as to the expense incurred in removing the tree but expressed the opinion that it approximated $100 and that firewood in the amount of $25 was obtained from the tree. Applying the rule of Cohan v. Commissioner, supra, we have found that petitioner sustained a loss of $50 on the destruction of the tree. That amount was deductible as a casualty loss. *347 As with respect to the loss claimed on account of the destruction of the tree, we know nothing as to the value of the petitioner's residential property either before or after the damage to the septic tank drain and to the water line. Nor do we know anything as to the cost of the property. Petitioner kept no records as to the cost of repairing the septic tank drain. However, he estimated that such cost was about $125 and he estimated that the cost of replacing the water line would be about $60. Applying the rule of Cohan v. Commissioner, supra, we have found that petitioner sustained a loss of $100 on account of damage to the septic tank drain and the water line. That amount was deductible as a casualty loss. Issue (3). Loss Deduction Taken for 1950 Findings of Fact In 1949 the petitioner purchased an automobile called "The Prefect" from a dealer in Hyattsville, Maryland. "The Prefect" was advertised by the Ford Motor Company, Dearborn, Michigan, as "A Ford Product Made In England - Sold All Over The World," as an automobile of "trustworthy dependability" and as an automobile which to know "is to become its enthusiastic friend." "The Prefect" was first sold *348 in the United States in 1949. At the time the petitioner purchased his car the dealer from whom the purchase was made informed him that the car was an "unknown quantity" to the dealer, that the dealer had never seen one of the cars until shortly prior to the sale and that the dealer was selling the cars only on the basis of the Ford reputation. Sometime after the expiration of the Ford Motor Company warranty on the automobile it began to require larger outlays for repairs and replacements than the petitioner thought it should. After unsuccessful efforts to obtain reimbursements from Ford Motor Company for such outlays, petitioner brought suit against the company in the Municipal Court of the District of Columbia for rescission of his purchase of the automobile and the return of the purchase price of $1,628. The suit was grounded on the claim that contrary to the company's implied warranty the automobile was not fit and suitable for the use to which it was reasonably expected to be put. The company moved to dismiss the suit and, on August 11, 1950, the court granted the motion and dismissed the suit for the following reasons: (1) that there was no privity between the parties, (2) that *349 there were no allegations based upon fraud and deceit, (3) that there was no showing of implied warranty, and (4) that the express warranty, which was in lieu of all warranties and undertakings, had expired. Thereupon petitioner considered bringing suit against the company in Maryland where he thought the courts would hold that there was privity between him and the company. However, after an investigation he concluded that he would be unable to obtain service on the company in Maryland. As a consequence he later decided in 1950 not to institute suit against the company in Marland. Because of the amount involved, he also decided not to attempt suit against the company in Michigan. Petitioner's efforts to sell the automobile have been unsuccessful and the best offer he has been able to obtain as a trade-in allowance was $400 in 1950 on the purchase of a new American-made Ford automobile. Petitioner still owns "The Prefect" automobile. In his income tax return for 1950 the petitioner took a deduction of $1,353 as a loss from casualty or theft resulting from the breach of an implied warranty in the sale of the automobile. The loss was computed by adding to the cost of the automobile, *350 $1,643, an amount of $110, representing the portion of repairs made to the car which petitioner considered to be excessive, and deducting from the total the amount of $400, representing a trade-in allowance offered by a dealer on the purchase of a new Ford automobile. The respondent disallowed the deduction. Opinion There is nothing of record to indicate that the petitioner suffered any loss in 1950 or in any other year on "The Prefect" automobile by reason of damage thereto from fire, storm or shipwreck, or by reason of damage from any other source which could be termed a casualty. This leaves for consideration only the question of whether he sustained any loss on the automobile by reason of theft. The petitioner's position on this point is that the design and construction of the automobile was such that the automobile was not suitable for ordinary use in the United States, that the representation of the Ford Motor Company to the contrary was false, that the sale of the automobile to him under such circumstances constituted a "fraud" or "swindle" upon him and resulted in a loss to him deductible as loss from theft. The petitioner has placed in evidence copies of the pleadings *351 in his suit against Ford Motor Company in the Municipal Court for the District of Columbia. Constituting a part of the motion filed by the company to dismiss petitioner's suit is an alleged copy of the "Retail Buyer's Order" used by petitioner to place his order for the automobile in question. The copy of the order contains the following on its face: "Manufacturer's warranty is shown on back of this order. It is agreed that there are no other warranties, either expressed or implied covering said car. "This order is not binding on dealer until accepted by dealer in writing. "I have read the matter printed on the back hereof and agree to it as a part of this order the same as if it were printed above my signature. "The front and back of this order comprise the entire agreement pertaining to this purchase and no other agreement of any kind, verbal understanding or promise whatsoever, will be recognized. "Receipt of a copy of this order is hereby acknowledged." The manufacturer's warranty appearing on the back of the copy of the order contains the following: "The Ford Motor Company warrants all such parts of new automobiles, trucks and chassis, except tires, for a period *352 of ninety (90) days from the date of original delivery to the purchaser of each new vehicle or before such vehicle has been driven 4,000 miles, whichever event shall first occur, as shall, under normal use and service, appear to it to have been defective in workmanship or material. This warranty shall be limited to shipment, to the purchaser without charge, except for transportation, of the part or parts intended to replace those acknowledged by the Ford Motor Company to be defective. The Ford Motor Company cannot, however, and does not accept any responsibility in connection with any of its automobiles, trucks or chassis when they have been altered outside of its own factories or branch plants. If the purchaser shall use or allow to be used in the automobile, truck or chassis, parts not made or supplied by the Ford Motor Company, then this warranty shall become void. The Ford Motor Company does not undertake responsibility to any purchaser of its products for any undertaking, representation of warranty made by dealers selling its products, beyond those herein expressed. "The Ford Motor Company reserves the right to make changes in design and changes or improvements upon its products *353 without imposing any obligation upon itself to install the same upon its products theretofore manufactured. "This warranty does not apply to used cars or cars not mentioned in the above order." Since petitioner has placed the copy of the order in evidence and does not here contend that it is not a correct copy, we conclude that it is a correct copy. From a consideration of the above quoted provisions of the order in connection with the facts relating to this issue, it is difficult to see wherein there was any breach by Ford Motor Company of any warranty, either expressed or implied, respecting the automobile, or wherein the company perpetrated any fraud or swindle on the petitioner. Although petitioner appears to have made substantial outlays for repairs to the automobile, they were made after the expiration of the warranty period, and under the terms of the agreement of purchase the company assumed no liability with respect to them. The responsibility for making such repairs and such outlays was assumed by petitioner under his purchase agreement. The outlays were not in any sense a loss resulting from theft. They were merely nondeductible personal expenses incurred in the operation *354 of an automobile not shown to have been used in a trade or business. Issue (4). Traveling Expenses for 1949 and 1950 Findings of Fact On some undisclosed date, the petitioner, at the instigation of United Auto Workers Union, accepted employment as attorney to obtain vacation pay for a group of veterans employed by General Motors Corporation. His employment was on a contingent fee basis and in event he were unsuccessful he was not to receive anything. Litigation instituted by him in the matter terminated in 1950 adversely to his clients. The foregoing employment had no connection with his full time employment by the United States Department of Labor. In connection with the above mentioned litigation, the petitioner in 1949 made one trip from his home to Indianapolis, Indiana, and in 1950 made two trips to Indianapolis. In making these trips the petitioner traveled in his own car and also incurred expenses for meals and lodging, for none of which was he reimbursed by his clients. The expenses so incurred were $50 in 1949 and $100 in 1950. Opinion The petitioner took no deduction for traveling expenses in his returns for 1949 and 1950, but by an amended petition seeks a deduction *355 of $73 for 1949 and $146 for 1950 for such purpose. He testified that his employment to obtain vacation pay for the group of veterans was accepted in the expectation of obtaining a substantial fee for his services. So far as appears, he kept no records as to the expenses incurred in making the trips to Indianapolis and the instant record fails to disclose the amount of time spent on those trips, either in Indianapolis or between there and his home. Petitioner expressed the opinion that his expenses for the trip in 1949 were $73 and $146 for the two trips in 1950. From the meager evidence bearing on the point and applying the rule of Cohan v. Commissioner, supra, we have found that petitioner incurred traveling expenses of $50 in 1949 and $100 in 1950. Petitioner is entitled to deduct the total of those amounts, $150, in 1950 as a loss sustained in that year in a transaction entered into for profit. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. * * *↩