**LACK v. WESTERN LOAN & BUILDING CO. et al.**

No. 10158.

Circuit Court of Appeals, Ninth Circuit.

April 9, 1943.

Rehearing Denied May 21, 1943.

John L. Schaefer and Henry S. Dottenheim, both of Los Angeles, Cal. (Henry S. Dottenheim, of Los Angeles, Cal., of counsel), for appellant.

George E. Lindelof, Jr., of Los Angeles, Cal., and H. L. Mulliner, of Salt Lake City, Utah, for appellee, Western Loan & Building Co.

Before MATHEWS, STEPHENS, and HEALY, Circuit Judges.

MATHEWS, Circuit Judge.

In the District Court of the United States for the Southern District of California, Western Loan and Building Company, a Utah corporation, hereafter called Western, brought an action against F. S. Lack, a citizen of California, and Pearl Assurance Company, Limited, a British corporation, hereafter called Pearl. Western prayed judgment against Pearl for $28,067.87 and prayed judgment against Lack quieting Western's title to the $28,067.87. Lack answered, praying judgment against Western for $28,067.87. Pearl deposited $28,067.87 in the registry of the court, there to abide

**1018**

the judgment of the court, and filed an answer stating that it had done so and praying to be discharged from further liability.[1]

In a State court of California, Lack brought an action against Western for specific performance of a contract between him and Western or (in lieu thereof) damages in the sum of $100,217.87, and for such other relief as might seem meet and just. On petition of Western, this action was removed from the State court to the District Court of the United States for the Southern District of California. There Western answered, praying that Lack take nothing, and that Western have judgment quieting its title to a building called the Hotel Dunlack in Brawley, California, the land on which the building stood, and all furniture, furnishings, fixtures and equipment[2] located in the building.

The actions were consolidated, trial was had, findings of fact and conclusions of law were made and filed, and judgment was entered (1) discharging Pearl from further liability, (2) awarding the $28,067.87 to Western, (3) quieting Lack's title to all furniture, furnishings, linens, dishes and silver located in the building and to all restaurant equipment located in and not attached to the building, and (4) quieting Western's title to all other property, real and personal, hereinabove mentioned. From parts (2) and (4) of the judgment Lack has appealed. Parts (1) and (3) are not appealed from. The facts are as follows:

Prior to September 6, 1934, Western became the owner of the land and building hereinabove mentioned, and Lack became the owner of the furniture, furnishings, linens, dishes, silver and restaurant equipment located in the building. On September 6, 1934, Lack wrote Western a letter reading, in part, as follows:

"For your consideration, I respectfully submit the following offer for the Hotel Dunlack property, located in Brawley, California: The total purchase price to be $35,-000.00, and to be paid as follows: Interest to be six per cent per annum, commencing January 1st, 1935, payable quarterly for the first year. Thereafter, in addition to the interest, $900.00 to be paid quarterly on the principal, until the full purchase price is paid. That is, principal payments shall commence January 1st, 1936. All taxes and assessments on the property to be paid by me, before delinquency. As a guarantee that all payments, outlined above, will be made promptly, I will give you bill of sale for all the furniture and fixtures now contained in the said property, free and clear of all encumbrance. * * *"

On October 30, 1934, Lack executed a bill of sale transferring to Western all furniture, furnishings, linens, dishes, silver and restaurant equipment then located or thereafter to be placed in the building. On November 10, 1934, Western and Lack executed a contract whereby Western leased all the property[3] to Lack for the term of six years commencing January 1, 1935, and ending December 31, 1940, and granted him an option to purchase the property for $35,000. This was the contract of which Lack, in his action against Western, sought specific performance. The contract provided:

"The rent for the premises hereunder demised, which rent the Lessor [Western] hereby reserves and which rent the Lessee [Lack] hereby covenants to pay shall be payable as follows:

"The Lessee agrees to pay and the Lessor agrees to accept the following sums: Five Hundred Twenty-five and no/100 Dollars ($525.00)[4] on January 1, 1935; Five Hundred Twenty-five and no/100 Dollars ($525.00) on April 1, 1935; Five Hundred Twenty-five and no/100 Dollars ($525.00) on July 1, 1935; Five Hundred Twenty-five and no/100 ($525.00) on October 1, 1935; Fourteen hundred and no/100 Dollars ($1400.00)[5] on January 1, 1936, and quarterly thereafter the sum of Eight Hundred Seventy-five and no/100 Dollars ($875.00) plus interest at the rate of six per cent (6%) per annum on the balance remaining under this lease;[6] said rents falling due on the first

---

[1] Jud.Code § 24(26) (e), 28 U.S.C.A. § 41(26) (e); Federal Rules of Civil Procedure, rule 67, 28 U.S.C.A. following section 723c.

[2] Including linens, dishes, silver and restaurant equipment.

[3] Land, building, furniture, furnishings, fixtures and equipment, including linens, dishes, silver and restaurant equipment.

[4] Interest on $35,000 (the purchase price of the property) for three months at 6% per annum.

[5] Interest on $35,000 for three months at 6% per annum, plus $875.

[6] The contract did not define or explain the phrase "balance remaining under this lease," but the parties treated it as meaning the unpaid part of the purchase price.

day of January, April, July and October of each year until the expiration of this lease.

"Said rent is to be paid * * * to the Lessor at 1005 South Hill Street, Los Angeles, California, or at such other place as the Lessor may from time to time designate by written notice to the Lessee.

"In addition to the payments aforesaid, the Lessee agrees, in order to take care of the taxes herein agreed, to be paid by him, to pay or deposit with Lessor monthly, a sufficient amount so that the aggregate thereof on the date when taxes become due, shall be sufficient to pay the taxes on said premises and properties when due, * * *.

"The Lessee further covenants and agrees to keep said premises and properties, including but not limited to the roof, windows and side walls, in good order and repair during the term hereof. * * *

"All alterations, repairs, additions or improvements made upon the demised premises by the Lessee shall be the property of the Lessor and shall remain upon and be surrendered with the demised premises upon the expiration of this lease, * * *.

"If the demised premises be damaged by fire or other casualty so that they cannot be repaired or restored within twenty (20) working days after possession is given to the Lessor for that purpose, then and in that event this lease shall terminate and the parties hereto shall be released from all obligations hereunder thereafter accruing, but if such damage can be repaired within said period of twenty (20) days then and in that event the Lessor shall repair said demised premises at its own cost and expense, provided that labor and materials can be obtained at the then prevailing rates, reasonable allowance being made for any delay from strikes or other causes beyond the control of the Lessor. * * *

"The Lessee covenants and agrees to keep at all times during the term hereof all buildings and improvements, which are now or shall hereafter be erected upon said premises and the furniture and furnishings therein, insured against loss or damage by fire in an amount satisfactory to the Lessor, and such other insurance as the parties may agree upon, in some insurance company or companies approved by the Lessor, * * * and to pay all premiums upon such insurance promptly when due, the policies for all of which insurance shall be satisfactory in form and substance to the Lessor. All of said policies of insurance shall provide that loss thereunder shall be payable to the Lessor and shall be delivered to and held by the Lessor. The Lessor shall have full power to adjust, collect, receipt for and compromise any claims under any of said policies of insurance. * * *

"The Lessee further covenants and agrees to promptly pay or cause to be paid before delinquency all taxes, charges and assessments levied or assessed or payable on or before January 1, 1935, upon or against said demised premises and properties, or any part thereof, or any interest of the Lessor or the Lessee therein, * * * and to keep said demised properties free and clear of all claims, or encumbrances affecting or purporting to affect the title. * * *

"At any time during the term hereof, provided that the Lessee shall not be in default in the performance of any promise, covenant or condition herein contained provided to be performed by the Lessee, Lessee is hereby granted the option to purchase said demised premises and properties from the Lessor for a purchase price of Thirty-five Thousand and no/100 Dollars ($35,000.00), together with interest thereon at the rate of six per cent (6%) per annum from the 1st day of January, 1936, to the date upon which the Lessee agrees to purchase said property in accordance with the terms of the said option. Said option shall be exercised by the delivery of written notice of the exercise thereof to the Lessor at the place where the rent hereunder shall be payable. * * *

"The purchase price shall be payable as follows: Seventeen Thousand Five Hundred and no/100 Dollars ($17,500.00) of said purchase price and a sum equal to interest upon said purchase price at the aforesaid rate from January 1, 1936, until the date of the exercise of said option shall be paid by the Lessee to the Lessor upon the date the Lessee exercises his option to purchase said property. There shall be credited upon said payment and upon said purchase price all payments theretofore received by the Lessor from the Lessee as rental pursuant to the terms hereof. The balance of the said purchase price, together with interest thereon at the rate of six percent (6%) per annum from the date upon which the Lessee exercises the said option until the entire purchase price is fully paid, shall be payable in quarterly installments of Eight Hundred Seventy-five and no/100

Dollars ($875.00) plus interest on balance due as above set forth, said payment being due and payable on the first day of January, April, July and October of each year until the whole purchase price has been paid. * * *

"The Lessor may deliver a good and sufficient deed to the Lessee conveying title to said property * * *. Contemporaneously with the delivery of said deed, the Lessee, shall either pay the unpaid balance of the purchase price or execute and deliver to the Lessor his several promissory notes, payable to Western * * * in a sum equal to the unpaid balance of the purchase price, with interest * * *."

On December 1, 1934, Lack wrote Paul W. Richardson (Western's California manager) a letter reading, in part, as follows:

"Upon request of Mr. [Charles R.] Berdel, your San Diego agent, am submitting to you my understanding of the purchase by me of the Hotel Dunlack property, situate in Brawley, California. The executive board of [Western] accepted my written proposition [7] for the purchase of the property, and you were authorized by [Western's] Salt Lake office to notify me to that effect and further told me I could go ahead and make purchase of new lobby furniture and rehabilitate the hotel, which I proceeded to do. I also signed the contract [8] prepared by you for the purchase and executed and delivered a bill of sale to [Western] for the entire furnishings of the hotel, thereby complying with my part of the contract to the letter. * * * The question of taxes came up at the meeting of the executive board and you told them all taxes had been paid. However, that does not enter into it, for I purchased the property for a fixed amount. * * *"

Lack took possession of the property on January 1, 1935, and continuously thereafter retained such possession. Between January 1, 1935, and May 18, 1940, he made improvements and placed new equipment in the building, expended therefor more than $18,000, and made each and all of the quarterly payments which the contract required of him during that period. In 1939 he procured and caused to be issued and delivered by Pearl to Western two insurance policies (Nos. 514,753 and 515,739) dated, respectively, May 6, 1939, and November 6, 1939.[9] Thereby Pearl insured Western against loss or damage to the building by fire or earthquake. Each policy provided:

"It is understood that F. S. Lack (hereinafter termed vendee) has an interest in the within described property by virtue of contract of sale from Western Loan & Building Company of Salt Lake City, Utah (hereinafter termed vendor).

" * * * If this policy be not payable to a mortgagee, trustee or beneficiary under deed of trust,[10] the proceeds of this policy, subject to all its terms and conditions, shall be payable to said vendor and/or said vendee as follows:

"First: To said vendor, to an amount not exceeding the balance unpaid, at the time of loss, upon the contract of sale above referred to; and

"Second: The balance, if any, to said vendee."

On May 18, 1940, the building was damaged by an earthquake. Between May 18, 1940, and July 1, 1940, Western and Lack submitted to Pearl a joint proof of loss, and Western's agent told Lack that he need not make any of the payments falling due under the contract after May 18, 1940; that they (Western and Lack) could "settle that up" after they received the insurance money. Lack consequently made no further payments. On September 11, 1940, Pearl, Western and Lack executed an agreement determining the extent of the damage to the building. In that agreement Western and Lack described themselves as vendor and vendee. The damage to the building was such that, under its policies hereinabove mentioned, Pearl was liable for $28,067.87. This sum was claimed by Western and by Lack.

Western's action against Lack and Pearl was commenced on December 16, 1940. Lack's action against Western was commenced on December 30, 1940. In each action, Lack alleged and Western denied that Lack had exercised the option granted him

---

7 The proposition made in Lack's letter of September 6, 1934.

8 The contract of November 10, 1934.

9 Policy No. 514,753 was issued and mailed to Western on or about March 15, 1939. Receipt thereof was acknowledged by Western on April 26, 1939. Policy No. 515,739 was issued and mailed to Western on or about August 30, 1939. Receipt thereof was acknowledged by Western on September 20, 1939.

10 Neither policy was payable to a mortgagee, trustee or beneficiary under deed of trust.

by the contract of November 10, 1934. The trial court found that Lack had not exercised the option. The correctness of that finding is challenged by this appeal.

As shown above, the contract provided that the option should be exercised "by the delivery of written notice of the exercise thereof" to Western. No particular form of notice was required. Any writing which apprised Western of Lack's exercise of the option was sufficient. Lack did not, so far as the record shows, deliver to Western a written notice stating: "I hereby notify you of my exercise of the option." He did, however, write Western a letter (hereinabove quoted) on December 1, 1934; cause the letter to be delivered to Western on or before December 4, 1934; procure policy No. 514,753 on March 15, 1939; and cause the policy to be delivered to Western on or before April 26, 1939.[11] The letter declared that Lack had purchased the property mentioned in the contract. The policy declared that Lack had an interest in the property by virtue of a contract of sale from Western to Lack. The policy described Western and Lack as vendor and vendee. It is clear that the policy (if not the letter) constituted written notice of Lack's exercise of the option. We hold, therefore, that the option was exercised on, if not before, April 26, 1939.

The damage to the building by the earthquake of May 18, 1940, was such that it could not be repaired in 20 working days.[12] Therefore, by the terms of the contract, the lease from Western to Lack (if not terminated by the exercise of the option) would have been terminated by the earthquake. Western contends that the earthquake terminated, not only the lease, but also the period during which the option could be exercised. Whether this contention is correct or not need not be considered; for, as has already been shown, Lack exercised the option long before the earthquake.

Having exercised the option, Lack was obligated to pay Western the purchase price of the property ($35,000), plus interest, less quarterly payments made by him, as provided in the contract, and Western was obligated to convey the property to Lack upon receipt of the purchase price, plus interest, less such quarterly payments. Lack's quarterly payments prior to May 18, 1940, were sufficient to pay $15,750 of the purchase price, plus interest to July 1, 1940, leaving an unpaid balance of $19,250. Thus, of the $28,067.87 for which Pearl was liable under its policies, $19,250 was payable to Western, and $8,817.87 was payable to Lack.

Lack claimed the entire $28,067.87, including Western's $19,250. The ground of his claim was that, by the terms of the contract, Western was obligated to repair the damage to the building at its own expense, but had failed to do so; that Lack, therefore, was entitled to make such repairs at Western's expense; and that such repairs would cost more than $28,067.87. The claim, in so far as it related to Western's $19,250, was properly rejected; for, as said before, the damage to the building could not be repaired in 20 working days. Therefore Western was under no obligation to make such repairs or to pay the cost thereof.

In Western's action against Lack and Pearl, Western alleged that Lack "failed to pay the taxes for the year 1940 on said property to the amount of $817.73," and that Western was required to and did pay said taxes. In Lack's action against Western, Western alleged that Lack "defaulted in the payment of taxes as agreed by him" and was "in default thereof in the sum of $3,784.16." These allegations were denied and not proved. There was no finding, nor any basis for finding, that Western was required to or did pay any tax on the property, or that Lack was at any time "in default thereof."

The judgment (so far as here appealed from) is reversed, and the case is remanded with directions to enter judgment awarding to Western $19,250 of the $28,067.87 deposited by Pearl in the registry of the court, awarding to Lack the balance ($8,817.87) of said $28,067.87, and requiring Western to convey to Lack all the property hereinabove mentioned.

Reversed and remanded.

---

[11] Also, on August 30, 1939, Lack procured policy No. 515,739, the language of which was identical with that of policy No. 514,753. Policy No. 515,739 was delivered to Western on or before September 20, 1939.

[12] The trial court so found, and the finding is not challenged.