**ROYAL ZENITH CORPORATION,**
Appellee,

v.

**CITIZENS PUBLICATIONS, INC., J. W. Grant and Carroll T. Westbrook,**
Appellants.

No. 54009.

Supreme Court of Iowa.

Sept. 2, 1970.

Nelson & Fassler and Maurice L. Nathanson, Cedar Rapids, for appellants.

Simmons, Perrine, Albright & Ellwood, Robert C. Tilden and James C. Nemmers, Cedar Rapids, for appellees.

UHLENHOPP, Justice.

The problem presented by this case is whether a seller of goods under conditional sale contract is entitled to recover the price from the buyer after the goods have been destroyed by fire while in the buyer's possession and the seller has received insurance proceeds from its own insurer. See also State v. Rees, 258 Iowa 813, 139 N.W. 2d 406; Preferred Investment Co. v. Westbrook, 174 N.W.2d 391 (Iowa).

Royal Zenith Corporation imports machinery from Europe and sells it in America. In April 1963 it bought a blanket policy from Switzerland General Insurance Company covering various types of property including goods sold on conditional sale contracts to the extent of the unpaid balances. The policy provided, "It is warranted by the assured that they will require conditional sales customers to provide insurance against fire on the property sold on this basis and insured hereunder. The coverage provided by this policy shall be excess over such specific insurance." Also, "Warranted by the Assured that this insurance shall not enure directly or indirectly to the benefit of any carrier, bailee or other party, by stipulation in bill of lading or otherwise, and any breach of this warranty, shall render this policy of insurance null and void." Also, "It is expressly agreed that upon payment of any loss or advancement or loan of moneys concerning the same, that the Assured will, at the request and expense of the Company and through such counsel as the Company may designate, make claim upon and institute legal proceedings against any carrier, bailee or other parties believed to be liable for such loss, and will use all proper and reasonable means to recover the same." .

Prior to the events in question in 1964, J. W. Grant and Tom Kuncil operated a printing establishment in Cedar Rapids, Iowa, as Citizen Publications. A. D. Beers, an independent salesman, tried to interest them in buying a printing press. The press would be sold directly by Royal Zenith to Citizen Publications, and Beers would receive a commission. Beers contacted Royal Zenith, which ran a credit check through Citizen Publications' bank. The report disclosed that Citizen Publications had an

average bank balance from zero to two figures and was being sued by another organization for nonpayment. The bank could not recommend the printing press transaction, and Royal Zenith refused to sell.

Grant approached Carroll T. Westbrook, who owned an insurance agency. Westbrook thought he could have his printing done by Citizen Publications and believed an opportunity for profit existed. Citizen Publications was thereupon incorporated with Grant as president and Westbrook as treasurer. Westbrook held half the stock, for which he contributed $7,000. Of that amount, $4,166 was for the cash payment on the press which will be mentioned.

Royal Zenith ran a credit check through Westbrook's bank, which disclosed that Westbrook maintained an average balance in four figures and owed a long term loan in four figures. The bank had no recommendation on Westbrook's ability to carry the printing press transaction. Westbrook's unaudited financial statement was submitted to Royal Zenith showing a net worth of $802,610, with the insurance agency included as an asset at a million dollars. Royal Zenith decided to sell the press to Citizen Publications on conditional sale guaranteed by Grant and Westbrook personally.

Royal Zenith priced the press in two ways—$41,620 for cash or $55,106 on time. The time price would be payable $4,160 down with the balance in monthly installments over six years. The difference of $13,486 in the cash and time prices was computed by Royal Zenith by subtracting the down payment from the cash price, leaving $37,460, and by multiplying that figure by 6% times six years or .36. Citizen Publications bought for the time price.

The conditional sale contract was prepared with the figures set forth in the appropriate spaces. The contract form also contained spaces for cost of insurance charged to buyer and official fees. Those spaces were left blank. The first monthly payment would be due July 1, 1964. The contract was signed by seller and buyer, and Grant and Westbrook signed their personal guaranty. They acknowledged their signatures on the instruments on May 4, 1964.

The conditional sale contract provided, "Buyer covenants and agrees * * * to be responsible for all loss or damage to said property by fire, theft, or other casualty whatsoever; * * *" Also, "Injury to, or loss or destruction of said property, from whatever cause shall not release Buyer from payment as provided herein." Also, "Buyer will keep said property insured against all risks of loss or damage from every cause whatsoever for not less than the aggregate amount owing hereunder. All said insurance shall be in form and amount and with companies satisfactory to Seller. All insurance for loss or damage shall provide that losses, if any, shall be payable to Seller as its interests may appear." The contract contained the usual clause authorizing the seller to accelerate future payments on breach by the buyer.

Royal Zenith received the down payment of $4,160. The press was shipped to Citizen Publications and was installed.

On June 16, 1964, Citizen Publications obtained an insurance binder from Safeguard Insurance Company against loss by fire and other perils, covering the contents of the printing establishment up to $50,000 until noon on August 15, 1964. Apparently the binder did not contain a loss-payable clause in Royal Zenith's favor.

On July 1, 1964, the first installment under the conditional sale contract was due. Westbrook wrote Royal Zenith for an extension. The parties agreed the payments should be extended one month.

The installment due August 1, 1964, was not paid.

On August 7, 1964, Citizen Publications obtained two insurance policies from Mutual Service Casualty Insurance Company against loss by fire and other perils. One

was for $20,000 for business interruption. The other was for $48,000, which was divided into $25,000 on the building, $16,000 on its contents, and $7,000 on a nearby dwelling. Apparently no loss-payable clauses naming Royal Zenith were included in these policies.

On the morning of August 15, 1964, the building of Citizen Publications and the press in question were destroyed by fire.

No payments were made under the conditional sale contract following the fire.

On March 19, 1965, Royal Zenith received $37,460 from Switzerland General under a loan receipt. See Glancy v. Ragsdale, 251 Iowa 793, 102 N.W.2d 890 (relating to use of a loan receipt). The loan receipt recited the money was received "as a loan, without interest, under policy # T4418 repayable only in the event and to the extent that any net recovery is made by us from any person or persons, corporation or corporations, or other parties, on account of loss by fire, sprinkler leakage, or other casualty for which this company may be liable occasioned to said property on or about 18 day of August 1964." In the receipt Royal Zenith pledged to Switzerland General any recovery it might make and agreed, if necessary, "to commence, enter into and prosecute suit against such person or persons, corporation or corporations, through whose negligence the aforesaid loss was caused, or who may otherwise be held responsible therefor, with all due diligence, in our own name, but at the expense of and under the exclusive direction and control of the Switzerland General Insurance Company."

On July 13, 1965, Royal Zenith filed its petition in the present action seeking recovery of the time price for which the press was sold. The action against Citizen Publications is on the conditional sale contract and notes and against Westbrook and Grant on their guaranty.

In the summer of 1966, in two actions, Citizen Publications sued the Safeguard and Mutual Service insurance companies for the insurance on the building, contents, and interruption of business. Those actions are pending.

Trial of the present action, without a jury, began on October 27, 1966. Summary judgment was rendered against Citizen Publications. The principal defense asserted by Westbrook and Grant was lack of consideration for their guaranty. In the course of the trial a working paper was introduced showing how Royal Zenith calculated the time price for insertion in the conditional sale contract, as previously explained. The conditional sale contract, showing the blank for the item of insurance charged to buyer, was also introduced.

One of the Royal Zenith's witnesses was its treasurer. On cross-examination he was asked if Royal Zenith had insurance on the press. Royal Zenith objected that such issue was not pleaded. But the trial court permitted defendants to pursue this line of testimony until defendants' counsel said he had no more questions. This testimony disclosed the facts already related—Royal Zenith had a blanket policy of its own and had received $37,460 under a loan receipt. Royal Zenith's insurance file with Switzerland General, as well as the loan receipt, were introduced in evidence.

After the foregoing evidence was received, the judgment against Citizen Publications was set aside on its motion. Defendants then amended their answers and averred "the plaintiff had in full force and effect a policy of insurance insuring the subject matter of the conditional sales contract against loss." Also, "That subsequent to the aforesaid fire and the said destruction of the said printing press, the plaintiff was fully and completely reimbursed and compensated for such loss by the aforesaid insurance policy as issued to the plaintiff herein." Defendants did not aver they paid for the Switzerland General policy in whole or in part or that such policy contained a loss-payable clause in their favor, or other facts which they contended entitled them to the benefit of that policy.

Royal Zenith filed a motion to adjudicate law points. After hearing the trial court ruled defendants' amendment did not state a defense.

Trial was resumed, resulting in judgment for Royal Zenith for the time price, attorney fees as provided in the contract, and costs. Hence this appeal by defendants.

Defendants have limited their appeal to the question whether Royal Zenith can recover the price of the press after receiving $37,460 from its own insurer, Switzerland General. Hence several other questions can be laid aside. Westbrook and Grant do not press their defense of lack of consideration, probably because of the decision in Preferred Investment Co. v. Westbrook, 174 N.W.2d 391 (Iowa). Defendants do not argue that Royal Zenith is not the real party in interest. Nor do defendants appeal from the allowance of the time price as the proper damages. Rather, defendants' contention is that Royal Zenith is not entitled to recover at all.

We are confronted with two problems. Can a seller under a conditional sale, which receives money from its own insurer after the goods are destroyed, recover the price from the buyer? Were defendants improperly prevented from showing the circumstances surrounding the purchase of insurance by Royal Zenith?

I. On the first problem, the events occurred before enactment of the Uniform Commercial Code and are governed by prior law. Iowa Code (1966) § 554.10101. Probably the result would be the same under present law. 8 Williston, Contracts (3d ed.) §§ 962A, 966.

This particular action was brought by the insured seller of the goods who gave its insurer a loan receipt, rather than by the insurer by way of subrogation. As will be seen, however, the determination of who must bear the ultimate loss is the same under the facts here whether the action be brought by the insured or the insurer.

▪ Had there been no fire and no insurance, this would simply have been an action for the price by a seller against a buyer who was in default under a conditional sale contract—and against the buyer's guarantors. Such a seller may recover the price notwithstanding it has retained title under the contract. Iowa Code (1962) § 554.64(2); Securities Inv. Corp. v. Noltze, 222 Iowa 678, 269 N.W. 866; 5 Williston, Contracts (3d ed.) § 735.

▪ The first complication is the destruction of the goods by fire. Ordinarily the seller may still recover the price, for the risk of loss is on the buyer under a conditional sale contract unless the parties shift the risk by contractual provision. Code (1962) § 554.23(1); 2 Williston, Sales (rev. ed.) §§ 392, 304; 8 Williston, Contracts (3d ed.) § 966. The parties did not shift the risk in this contract; they expressly reaffirmed it in the buyer.

The second complication is the receipt of money by the seller under its own blanket insurance policy. This presents the situation which exists when a mortgagee, lessor, bailor, shipper, consignor, vendor of realty, or seller of goods collects his own insurance, and then he or his insurer seeks to recover from the mortgagor, lessee, or other third party. The action against the third party may be in tort or on contract. When in tort—as for negligently or deliberately burning the insured res—no one questions the insured's right to recover, notwithstanding he has collected insurance from his own insurer, or the insurer's right to recover by way of subrogation. 6 Appleman, Insurance (1942) §§ 4091, 4092; Campbell, Non-Consensual Suretyship, 45 Yale L.J. 69, 76. The only problem relates to real party in interest, an issue not raised here.

But when the action by the insured or insurer is on a contractual right of the insured against the third party, difficulties arise. When the insurer sues, the action is referred to as subrogation to "collateral rights" of the insured. Note, 28 Col.L.

Rev. 202. In the three-sided situation, three possible solutions are said to exist: "(1) to permit the insured to recover from both the insurer and the contractual obligor and to retain both recoveries; (2) to give the insurer the right to be subrogated to the contractual obligation; or (3) to give the third-party contractual obligor the benefit of the insurance." King, Subrogation Under Contracts Insuring Property, 30 Tex.L.Rev. 62, 71. The first solution would not ordinarily appear to be an actual alternative; insurance policy provisions usually prevent double recovery by the insured. Normally the dispute will be between the insurer and the third party. Thus the actual alternatives appear to be the second solution, to allow subrogation by the insurer against the third party (or the same thing, recovery from the third party by the insured who has given the insurer some such instrument as the loan receipt here), or the third solution, to give the third party the benefit of the insurance.

Early authorities took a rather formal view of the matter, held insurance to be a personal contract between the insured and the insurer of no concern to the third party, and applied the second solution. In the mortgage situation, Justice Story said this in Carpenter v. Providence Washington Insurance Co., 16 Pet. 495, 501, 10 L.Ed. 1044, 1047:

"No doubt can exist that the mortgageor and the mortgagee may each separately insure his own distinct interest in the property. But there is this important distinction between the cases, that when the mortgagee insures solely on his own account, it is but an insurance of his debt; and if his debt is afterwards paid or extinguished, the policy ceases from that time to have any operation; and even if the premises insured are subsequently destroyed by fire, he has no right to recover for the loss, for he sustains no damage thereby; neither can the mortgageor take advantage of the policy, for he had no interest whatsoever therein. On the other hand, if the premises are destroyed by fire before any payment or extinguishment of the mortgage, the underwriters are bound to pay the amount of the debt to the mortgagee, if it does not exceed the insurance. But then upon such payment, the underwriters are entitled to an assignment of the debt from the mortgagee, and may recover the same amount from the mortgageor, either at law or in equity, according to the circumstances; for the payment of the insurance by the underwriters does not, in such a case, discharge the mortgageor from the debt, but only changes the creditor."

The early English decisions were in similar vein. Castellain v. Preston, 11 Q.B.D. 380; Raynor v. Preston, 18 Ch.D. 1.

The early view has been criticized, at least in situations in which it did not appear the third party was not intended to have the benefit of the insurance, on the ground it "gives the insurer a windfall in that its premiums did not take into consideration such collateral remedies". King, Subrogation Under Contracts Insuring Property, 30 Tex.L.Rev. 62, 71. See also Young, Windfall Coverages, 60 Col.L.Rev. 1063; Note, 28 Col.L.Rev. 202; Note, 11 Iowa L. Rev. 73; Comment, 72 Harv.L.Rev. 1380; Comment, 20 Md.L.Rev. 161.

In the course of time, the second and the third solutions have been variously applied, depending on the circumstances. Denying the third party the benefit of the insurance: Hartford Fire Ins. Co. v. Payne, 199 Iowa 1008, 203 N.W. 4 (shipper-carrier); Chicago, St. L. & N. O. R. R. Co. v. Pullman Southern Car Co., 139 U.S. 79, 11 S.Ct. 490, 35 L.Ed. 97 (lessor-lessee); Twin City Fire Ins. Co. v. Walter B. Hannah, Inc., 444 S.W.2d 131 (Ky.) (vendor-purchaser); Home Ins. Co. v. Bishop, 140 Me. 72, 34 A. 2d 22 (conditional sale); McCoy v. Continental Ins. Co., 326 Mich. 261, 40 N.W.2d 146 (vendor-purchaser); Nobbe v. Equity Fire Ins. Co., 210 Minn. 93, 297 N.W. 349 (lien); American Equitable Assur. Co. v. Newman, 132 Mont. 63, 313 P.2d 1023 (vendor-purchaser); Interstate Ice & Power Corp. v. United States Fire Ins. Co., 243 N.Y. 95, 152 N.E. 476 (dictum) (conditional sale); Commercial Union Fire Ins. Co. v.

Kelly, 389 P.2d 641 (Okl.) (lessor-lessee); Consolidated Freightways v. Moore, 38 Wash.2d 427, 229 P.2d 882 (lessor-lessee). Allowing third party the benefit of the insured's insurance: Brady v. Welsh, 200 Iowa 44, 204 N.W. 235 (vendor-purchaser) (but see contra dictum in Bartling v. German Mutual Lightning & Tornado Ins. Co., 154 Iowa 335, 343, 134 N.W. 864, 867); Gard v. Razanskas, 248 Iowa 1333, 85 N.W. 2d 612 (option); In re Future Manufacturing Cooperative, 165 F.Supp. 111 (N.D. Cal.) (conditional sale); Automatic Sprinkler Corporation of America v. Robinson-Slagle Lumber Co., 147 So. 542 (La.App.) (conditional sale); Eastern Restaurant Equipment Co. v. Tecci, 347 Mass. 148, 196 N.E.2d 869 (conditional sale); Gillingham v. Phelps, 5 Wash.2d 410, 105 P.2d 825 (conditional sale).

What is it that determines whether a third party is or is not entitled to the benefit of the insurance of the insured in a given case? Couch says this about subrogation (16 Couch, Insurance (2d ed.) § 61:12):

"By definition, the one claiming rights by way of subrogation must have been only secondarily liable for the payment which he has made, as contrasted with an obligation as to which he is primarily liable.

"The right arises out of the nature of the contract of insurance, as a contract of indemnity, where one is primarily responsible and the insurer is only secondarily liable, but there is no right of subrogation in one who is primarily liable."

Appleman says (6 Appleman, Insurance (1942) § 4051 pocketpart):

"Subrogation applies in all cases in which one party, not a volunteer, pays a debt for which another is primarily liable, which in equity and good conscience, should have been paid by the latter party."

Another writer says (King, Subrogation Under Contracts Insuring Property, 30 Tex. L.Rev. 62, 63):

"For the purpose of analyzing this equitable concept, one should note the general requirements given by the cases. They are three in number: first, that a third party be primarily liable to the insured for property loss or damage; second, that the insurer be secondarily liable for some or all of this loss by a contract of indemnity; and third, that the insurer has paid the insured under the policy."

By agreement the parties can, of course, cast the ultimate burden of loss among themselves wherever they choose. In a particular case the task is to divine, from what the parties said and did and the nature of the transaction, which one of them they intended should be the ultimate risk taker— who should be primarily and who secondarily responsible if loss occurred. 16 Couch, Insurance (2d ed.) § 61:209. A salient fact may demonstrate what that intention was. In the seller-buyer situation, if the buyer is to obtain insurance at his own expense for the seller's protection, and does so, plainly that insurer is intended to bear the loss as among the three parties. Lack v. Western Loan & Building Co., 134 F.2d 1017 (9 Cir.); Annotation, 64 A.L.R.2d 1402, 1416. In the consignment situation, if the consignment contract recites as to the consignee, "Risks of loss or damage from all hazards of any kind, with or without negligence on your part is yours", manifestly the consignee has the burden of loss as opposed to the consignor and his insurer. United States Fidelity & Guaranty Co. v. Slifkin, 200 F.Supp. 563 (N.D.Ala.). In the bailment situation, if the storage contract provides the storage company guarantees against loss by fire to the extent it receives payment from its insurer, clearly that insurer bears the ultimate loss to the extent of its limits, though the depositor also maintains insurance. Wells v. Thomas W. Garland, Inc., 39 S.W.2d 409 (Mo.App.).

What are the facts in the present case indicating who was intended to bear the ultimate burden of loss, Switzerland General, Royal Zenith, or Citizen Publications? The case has some features similar to

Jorski Mill & Elevator Co. v. Farmers Elevator Mutual Insurance Co., 404 F.2d 143 (10 Cir.). There the depositor of grain in a warehouse had a blanket insurance policy containing a subrogation clause. The warehouseman was required to and did have specific insurance on grain deposited in its warehouse. The specific insurer was held to be the ultimate loser.

Royal Zenith maintained a blanket policy with Switzerland General covering, among various types of property, goods sold on conditional sale. Probably the policy was carried as an extra precaution. The policy provided that conditional sale buyers be required to carry insurance and that the Switzerland General insurance was excess. It also provided the insurance should not directly or indirectly inure to the benefit of a carrier, bailee, or other party. It obligated Royal Zenith on occurrence of loss to take action against third parties under the insurer's direction.

Royal Zenith entered into a conditional sale contract with Citizen Publications. The contract did require Citizen Publications to carry insurance on the goods sold. In the contract Citizen Publications also agreed "to be responsible for all loss or damage" and that "destruction of said property, from whatever cause, shall not release Buyer from payment as provided herein."

We hold that as among Switzerland General, Royal Zenith, and Citizen Publications (and its guarantors), the parties evinced an intention the loss should fall on Citizen Publications. Whether the loss can be passed on to the Safeguard and Mutual Service insurance companies is not before us.

II. Defendants' contention they were not permitted to show the circumstances surrounding Royal Zenith's purchase of its insurance cannot be upheld. The trial court's ruling that Royal Zenith's insurance constituted no defense to defendants was based on the pleadings and was made under rule 105, Rules of Civil Procedure. At that time the pleadings contained copies of both the conditional sale contract and Switzerland General's insurance policy, including the provisions which we have held cast the burden of the loss on Citizen Publications. Defendants' pleadings did not aver that Citizen Publications paid for Royal Zenith's insurance in whole or in part or other facts which would show an intention to give Citizen Publications the benefit of that insurance. The trial court properly held on the pleadings before it that Royal Zenith's insurance constituted no defense. That took Royal Zenith's insurance out of the case. See rule 105, R.C.P. ("It shall enter an appropriate final order * * * which shall not be questioned on the trial of any part of the case").

Moreover, the trial court allowed defendants to interrogate Royal Zenith's officer about its insurance as far as they desired, despite Royal Zenith's objections. The examination brought out nothing showing an intention that Citizen Publications should have the benefit of the Switzerland General insurance, nor did Royal Zenith's insurance file or the loan receipt which were placed in evidence.

Affirmed.

All Justices concur except REES, J., who takes no part.